UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA, et al.,

    Plaintiffs,

Case No. 2:11-cv-11940

*ex rel.* AZAM RAHIMI,

HONORABLE STEPHEN J. MURPHY, III

    Plaintiff/Relator,

v.

RITE AID CORPORATION,

    Defendant.

_____/

**OPINION AND ORDER DENYING WITHOUT PREJUDICE DEFENDANT'S MOTION TO DISMISS [55] AND PERMITTING RELATOR TO FILE AMENDED COMPLAINT**

In May 2011, Relator Azam Rahimi filed his qui tam complaint against Defendant Rite Aid Corporation alleging violations of the False Claims Act (FCA) and analogous state laws. In June of 2011, the United States sought an extension to consider whether to intervene. ECF 3 (under seal). The Court granted the motion and administratively closed the case. In April 2013, the Court reopened the case only to allow Rahimi to file an amended complaint. ECF 13. Finally, in August 2016 and after more than five years of extensions requested by the Government, Rahimi filed a motion to reopen the case and set a deadline for government intervention. ECF 29. The Court conducted a sealed hearing on the motion and permitted Relator to file a second amended complaint.

On November 18, 2016, Rahimi filed his second amended complaint. ECF 44. The Court reopened the case and set a deadline for the Government to notify the Court of its intention to intervene. ECF 45 (under seal). The United States declined to

intervene. ECF 46. Rahimi served Defendant Rite Aid. Rite Aid responded to the Second Amended Complaint with a motion to dismiss. ECF 55. The Court reviewed the motion and finds that a hearing is unnecessary. E.D. Mich. L.R. 7.1(f). For the reasons below, the Court will deny without prejudice Defendant's motion to dismiss.

## BACKGROUND

The claim here arose after Rahimi, a pharmacist, became suspicious of Rite Aid's billing practices in regard to Medicare and Medicaid beneficiaries. Through a scheme described further below, Rahimi alleges that Rite Aid violated the FCA by submitting false claims to the Government and by failing to reimburse overpayments.

I.  The Claims

Plaintiff's Second Amended Complaint (SAC), ECF 44, contains twenty-one counts: one count for alleged violations of the FCA and twenty counts for alleged violations of various state court false claims statutes.[1] In particular, the FCA count alleges violations of 31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B), and (a)(1)(G). Those statutes impose liability on any person who:

> (A): "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;"
>
> (B): "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;"
>
> (G): "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money . . .

---

[1] Counts 2–21 include state or D.C. law claims for the following states: California, Colorado, Connecticut, Delaware, District of Columbia, Georgia, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Nevada, New Hampshire, New Jersey, New York, North Carolina, Rhode Island, Tennessee, Virginia, and Washington. Only nineteen state-based counts remain. On January 31, 2017, Plaintiff voluntarily dismissed the count alleging violations of Maryland's false claims law. ECF 51. The Court will refer to the states, excepting Maryland, as "Relevant States."

2

to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money . . . to the Government[.]"

31 U.S.C. §§ 3729(a)(1)(A), (B), and (G).

II.  The Parts of the Scheme

The alleged fraudulent scheme involved several parts, but there are three principal components: (1) Rite Aid's Rx Savings Program ("Rx Program"), (2) Medicare Part D, and (3) the Medicaid and Medicare Part D requirement that pharmacies charge government insurance programs the "usual and customary charge to the general public," *see* 42 C.F.R. § 447.512(b). To help understand the scheme, the Court will briefly explain each component.

A.  The Rx Program

Like many major pharmacies, Rite Aid offers hundreds of generic prescriptions at reduced prices through a prescription discount program. ECF 44-1, PgID 473. The Rx Program provides prescriptions at heavily reduced prices: a 30-day supply of certain generic drugs cost $8.99 and a 90-day supply of those drugs cost $15.99. *Id.* Enrollment in the Rx Program is free, and any person can join it—with one exception. The Rx Program's reduced prices do not extend to "[p]rescriptions paid for in whole or in part by publicly funded health care programs[.]" *Id.*

B.  Medicare Part D

Medicare Part D is a federal, voluntary prescription drug benefit program available to citizens eligible for Medicare. The Centers for Medicare and Medicaid Services ("CMS") oversees Medicare Part D. ECF 44, at PgID 426. CMS contracts with private insurance companies ("Part D Sponsors") that "compete for the opportunity to manage Part D beneficiaries' claim submissions and payment processes." *United*

3

*States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 635 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 627 (2017). Part D Sponsors and their subcontractors then "work directly with retail pharmacies to provide prescriptions to Part D beneficiaries." *Id.* Part D Sponsors negotiate with the pharmacies to determine how much the pharmacy will be paid for the drugs they dispense to Medicare enrollees. ECF 44 at 447.

    C.    Usual and Customary Charge

When a pharmacy dispenses prescription drugs to Medicare enrollees, it submits a claim for payment from the federal government, through Part D sponsors and intermediaries with which it has contracted. CMC's payments for drugs must not exceed a provider's "usual and customary charges to the general public," or, "U&C." 42 C.F.R. § 447.512(b). To comply with the limitation, "state Medicaid programs have enacted rules that require pharmacies to bill Medicaid no more than their [U&C]." ECF 44, PgID 429. States' Medicaid programs define U&C differently, but with the exception of California, all of the Relevant States' programs specifically require pharmacies to disclose the U&C in a designated field when billing the state Medicaid program. *See id.* at 431–45.

III.    <u>The Alleged Fraudulent Scheme</u>

In the alleged scheme, Rite Aid charged Medicare Part D and state Medicaid programs prices that "significantly exceed[ed] the prices that Rite Aid has routinely offered customers through its 'Rx Savings' discount program." ECF 44, PgID 424. Because the misrepresentations would tend to cause CMS to issue inflated reimbursements, Relator alleges the practice violated the False Claims Act, 31 U.S.C. §§ 3729–33.

4

**STANDARD OF REVIEW**

The Court may grant a Rule 12(b)(6) motion to dismiss if the complaint fails to allege facts "sufficient 'to raise a right to relief above the speculative level,' and to 'state a claim to relief that is plausible on its face.'" *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). The Court views the complaint in the light most favorable to the plaintiff, presumes the truth of all well-pled factual assertions, and draws every reasonable inference in favor of the non-moving party. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). If "a cause of action fails as a matter of law, regardless of whether the plaintiff's factual allegations are true or not," then the Court must dismiss. *Winnett v. Caterpillar*, Inc., 553 F.3d 1000, 1005 (6th Cir. 2009).

To prevent "fishing expeditions," complaints alleging FCA violations must satisfy a heightened pleading standard. *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 503, n.11 (6th Cir. 2007) (hereinafter "*Bledsoe II*")). In particular, FCA allegations must "comply with Rule 9(b)'s requirement that fraud be pled with particularity[.]" *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 914 (2017), *reh'g en banc denied*, (Jan. 3, 2018). If a relator "pleads a complex and far-reaching fraudulent scheme," the relator "must provide 'examples of specific false claims submitted to the government pursuant to the scheme' in order to proceed to discovery on the scheme." *Id.* (quoting *United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 838 F.3d 750, 768 (6th Cir. 2016)). "To plead fraud with particularity, the plaintiff must allege (1) the time, place, and content of the alleged misrepresentation, (2) the fraudulent

scheme, (3) the defendant's fraudulent intent, and (4) the resulting injury." *Chesbrough*, 655 F.3d at 467 (internal citation omitted).

As in any other context, the Court construes the *qui tam* complaint in the light most favorable to the plaintiff, accepts all factual allegations as true, and must determine whether the complaint pleads enough facts to state a claim for relief that is plausible on its face. *See id.* (quoting *Twombly*, 550 U.S. at 570).

## DISCUSSION

Plaintiff's complaint properly alleges Defendant's fraudulent intent and the resulting injury. The Court turns, therefore, to whether the Plaintiff pled with particularity false claims or the fraudulent scheme.

I. <u>Whether Relator Pled False Claims with Particularity</u>

As noted above, the SAC alleges violations of three separate subsections of § 3729(a)(1). Although the provisions are related, they require different showings. The Court will begin with subsection (A).

    A.    § 3729(a)(1)(A) Claims

A claim "requires proof that the alleged false or fraudulent claim was 'presented' to the government." *Ibanez*, 874 F.3d at 914 (quoting *United States ex rel. Marlar v. BWXT Y-12, LLC*, 525 F.3d 439, 445 (6th Cir. 2008)). "At the pleading stage, this standard is stringent;" the Relator must allege the fraudulent scheme and "identify a representative false claim that was *actually submitted* to the government." *Id.* (citing *Chesbrough*, 655 F.3d at 470) (emphasis added). An exception to the stringent particularity standard exists for Relators with "specific personal knowledge supporting a strong inference that a false claim was submitted." *Id.* (internal quotation omitted). The

6

Relator must describe, with particularity, the fraudulent scheme (i.e. step-by-step how the scheme works) and then "must provide a representative claim that describes each step with particularity[.]" *Id.* at 915 (i.e. a claim wherein an individual was covered by Medicare Part D, went to a Rite Aid pharmacy, sought a generic drug prescription, received that drug, the price between that drug for Rx Savings members and Medicare Part D recipients differed, and Rite Aid *actually billed* the Government the higher price).

The SAC provides only two "representative claims." *See* ECF 44, PgID 455, ¶¶ 90–91. Those claims seem[2] to have come from "John Doe," a personal friend of Relator who worked as a pharmacist for a Rite Aid in New York. *Id.* at 453–54, ¶ 88. Doe had fielded complaints from Medicare beneficiaries about the prices they were being charged and "checked with a customer, a Medicaid beneficiary, about the prices on the Rite Aid receipts pertaining to this customer's purchases of generic medications covered by the Rx Savings Program." *Id.* at 454, ¶ 89. From this, Doe

> learned not only that Rite Aid's billing software program had charged New York Medicaid significantly more for this individual's purchases than the amounts charged to Rx Savings Program members, but also that Rite Aid's program had represented on the receipts that these charges to Medicaid were Rite Aid's "U&C" prices.

*Id.* at 454–55.

The SAC then states the two representative claims. Both arose from purchases at a specific Rite Aid pharmacy in Astoria, New York[3]—one in January 2010, the other in December 2010. *Id.* In both cases, a Medicaid beneficiary received a specific

---

[2] The two paragraphs (90 and 91) do not make precise statements, but they are sandwiched between paragraphs discussing the genesis of John Doe's suspicions and his beliefs about Rite Aid's billing software.

[3] It is not clear whether John Doe actually worked at the store or another store in New York.

prescription drug and Rite Aid charged New York's Medicaid program for the prescription ($58.99 for the January purchase, $49.99 for the December one). At the time of each purchase, the Rx Savings prices for those drugs were $19.99 and $8.99, respectively. Relator concludes that Rite Aid's charges to the state Medicaid program were therefore false claims.

There is, however, a problem with the allegations: they fail to show that the higher prices were actually submitted to the sponsors or state programs, and effectively, to CMS. According to the SAC, Doe learned through his employment that Rite Aid's software "automatically assigns prices" based on the customer's information and only generates the Rx Savings price for customers enrolled in the program. ECF 44, PgID 454, ¶ 88. But he apparently learned through reviewing a customer's receipt what Rite Aid charged New York's Medicaid program and that it had represented the charges as U&C. *Id.*, ¶ 89.

Relator's own follow-up investigation likewise fails to reveal any false claims. Although he too is a pharmacist, he never worked for Rite Aid. So when he set out to "corroborate his friend's suspicion," he did so by merely calling Rite Aid pharmacies across the country and "asked each pharmacy for its Medicaid price" on two medications. *Id.* at 456, ¶ 94. The SAC details the answers Relator received, but, like Doe's information, those do not reveal that a false claim was actually submitted to a sponsor, state program, or CMS. *Id.* at 457–463, ¶¶ 96–115. In fact, Relator's inquiries do not even reveal whether the "Medicaid Prices" reported by the various Rite Aid

employees would have been that charged to cash-paying beneficiaries in the "donut hole"[4] or the price truly submitted to sponsors and state programs.

Relator's response brief relies heavily on *U.S. ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632 (7th Cir. 2016), a similar case involving Kmart's own prescription savings program. But in that case, the relator was himself a Kmart pharmacist who "examined hundreds of billing records at the stores where he worked," and his complaint specifically referred to submitted claim forms. *See* Second Amended Complaint, 2012 WL 6061462, ¶¶ 144, 156, 167. When the district court denied Kmart's motion to dismiss, it specifically referenced those paragraphs as providing "specific examples of the false *claims* submitted." *U.S. ex rel. Garbe v. Kmart Corp.*, 968 F. Supp. 2d 978, 983 (S.D. Ill. 2013) (emphasis added).

The SAC here, in contrast, does not point to any specific, submitted claims—only receipts relating to the consumer's transaction. Relator has pled a widespread scheme under the FCA and he must therefore "provide 'examples of specific false claims submitted to the government pursuant to that scheme' in order to proceed to discovery on the scheme." *Ibanez*, 874 F.3d at 914 (quoting *Prather,* 838 F.3d at 768). He must plead with particularity not just that the patient filled the prescription at a particular price, but that pharmacy then "actually submitted" the false claim to the Government. *See id.* at 915. Failure to do so warrants dismissal under the Sixth Circuit's general rule.

The rule is *general* because the Sixth Circuit recognizes a "personal knowledge exception" that allows for slightly relaxed pleading on this score. In *Prather*, the Court of

---

[4] The Medicare Part D "donut hole" refers to "a level of annual drug expenditures during which Medicare Part D withdr[aws] coverage until beneficiaries reach[] a specified, higher level of expenditures." ECF 44, PgID 454, ¶ 89.

9

Appeals recalled prior decisions that hypothesized how a complaint could survive dismissal even when "the relator is unable to produce an actual billing or invoice," provided he or she has "pled facts which support a strong inference that a claim was submitted[.]" *Prather*, 838 F.3d at 769 (citation omitted). For instance, it would be acceptable if the relator pled "personal knowledge of billing practices or contracts with the government," or personal knowledge "based either on working in the defendants' billing departments, or on discussions with employees directly responsible for submitting claims to the government[.]" *Id.* (quotation marks and citations omitted). The court then thoroughly recounted the relator's intimate involvement with the billing process to justify the application. *Id.* at 769–70.

The Sixth Circuit recently confirmed, however, that the exception employed by *Prather* applies only in "limited circumstances." *Ibanez*, 874 F.3d at 915. The *Ibanez* court recounted that the *Prather* relator was "specifically employed to review medical treatment documentation allegedly submitted to Medicare—i.e., she reviewed allegedly false claims themselves," and "[i]t was only this 'detailed knowledge of the billing and treatment documentation related to the submission of requests for final payment, combined with her specific allegations regarding requests for anticipated payments' that satisfied a relaxed 9(b) standard." *Id.* at 915–16 (quoting *Prather*, 838 F.3d at 770).

Relator Rahimi does not meet that exacting standard. He never worked for Rite Aid and thus does not have personal, specific knowledge of the scheme. Although he relies upon the input of Rite Aid pharmacist John Doe, the SAC is devoid of assertions that Doe had personal, specific knowledge of the billing practices similar to that

described in *Prather* and *Ibanez.* As pled, therefore, the SAC fails to meet Rule 9(b)'s standard.

Nevertheless, Relator still urges the Court not to dismiss the claim. In responding to Rite Aid's charge argument that the SAC does not adequately plead FCA violations in other states, Relator attached exhibits detailing claims purportedly submitted in New York and Massachusetts. ECF 62, PgID 1116–18. He contends that "[i]f there is any concern as to whether the two sample claims [in the SAC] meet Rule 9(b) requirements," he should "either be permitted to amend his complaint to include these additional false claims," or the Court should treat the SAC as "effectively supplemented by Exhibits B–D." *Id.* at 1118.

Merely treating the SAC as supplemented by the exhibits would not cure the deficiencies the Court has described. Rite Aid is compelled to respond only to the charges levied against it in a complaint. The representative claims in the SAC, as pled, fail to meet Rule 9(b)'s requirements. The relevant exhibits are summaries of alleged claims that Relator's lawyer "understand[s] Rite Aid submitted to the New York Medicaid program during the years 2008 through 2013." ECF 62-2, PgID 1141. But none of them refer to the transactions in the SAC. *Compare* ECF 62-4 *with* ECF 44, PgID 455, ¶¶ 90–91.

The exhibits do, however, reveal that Relator possesses additional information that might allow his amended complaint to survive dismissal. *Cf. U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 645 (6th Cir. 2003). Although the pending complaint is Relator's third, it is the first to face a motion to dismiss. For that reason, the

Court will give Relator an opportunity to amend the Complaint to remedy the Rule 9(b) deficiencies.

      B.      §§ 3729(a)(1)(B) and (G)

The Court's analysis related to § 3729(a)(1)(A) above applies with equal weight to Relator's claims under subsections (B) and (G). Claims under subsection (B) require the Relator to "plead a connection between the alleged fraud and an actual claim made to the government" and the "alleged connection must be evident." *Ibanez*, 874 F.3d at 916 (quoting *Chesbrough*, 655 F.3d at 473 and referencing *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662 (2008)). Subsection (G) claims must "allege facts that show defendants received overpayments from the government and failed to refund those payments." *Ibanez*, 874 F.3d at 916 (citing 31 U.S.C. § 3729(a)(1)(G) and *Prather*, 838 F.3d at 774). Alternatively, the Relator can plead adequate "'proof that the defendant made a false record or statement at a time that the defendant owed to the government an obligation'—a duty to pay money or property." *Id.* (quoting *Chesbrough*, 655 F.3d at 473). The SAC fails to plead that any particular claim was submitted to the Government, regardless of whether such a claim involved a false record. And absent a claim submission, the SAC states no separate obligation that Rite Aid owed to the Government. The (B) and (G) claims also fail, but, like the subsection (A) claim, could conceivably be salvaged through an amended complaint.

II.      <u>Whether Plaintiff Pled a Fraudulent Scheme with Particularity</u>

Rule 9(b)'s particularity requirements apply just as surely to the scheme alleged as to the claims animating the scheme, and relators must allege the "'who, what, when, where, and how' of the alleged fraud." *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006) (quoting *United States ex rel. Thompson v. Columbia/HCA*

12

*Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)). Rite Aid contends that the SAC falls short because it does not reveal who conceived of the scheme, how it was implemented nationwide, and why Relator could only muster two claims during an alleged 10-year timespan. ECF 55, PgID 698. Properly understood, however, the SAC has answered almost all the "5 Ws" in regard to the scheme:

(1) Rite Aid is the party that violated the FCA. *See Bledsoe II,* 501 F.3d at 506 (noting that when the relator "has alleged that the corporation has committed the fraudulent acts, it is the identity of the corporation, not the identity of the natural person, that the relator must necessarily plead with particularity.").

(2) Rite Aid did so by submitting claims for reimbursement to Medicare Part D sponsors and state Medicaid programs that misrepresented the U&Cs as lower than they actually are. ECF 44, PgID 463, ¶ 116.

(3) Rite Aid's actions are violations because, by not accounting for the Rx Program prices when calculating and consequently submitting its claims to the sponsors and state programs, it ultimately affected the reimbursements made by CMS. *Id.* at 463, ¶ 116. Rite Aid also allegedly violated the FCA by failing to repay the amounts overpaid. *Id.* at 464, ¶ 117.

(4) Rite Aid committed the violations from 2007 through the present—each time it submitted Medicaid or Medicare reimbursement claims on drugs for which it offered discounted prices through its Rx Program. As for the representative claims, it submitted them on or around January 21 and December 14, 2010—if false claims were indeed submitted.

(5) The SAC does not state where Rite Aid committed the violations. Perhaps the scheme employed various computers at discrete locations, running the software Rite Aid uses to submit its claims to the sponsors and state programs to carry out the alleged scheme. *See* ECF 44, PgID 454, ¶ 89. If Relator can cure the pleading defects already described above, perhaps he can also answer the question of where the violations occurred.

In sum, though the SAC fails to plead that particular false claims were actually submitted, it adequately set the stage for pleading that type of scheme. And the scheme is plausible—Kmart allegedly effected a similar one. *See Garbe*, 824 F.3d at 635, *cert. denied*, 137 S. Ct. 627 (2017).

III. <u>Whether Plaintiff Adequately Pled Materiality</u>

Under the FCA, a misrepresentation that gave rise to an action must have been "material to the other party's course of action." *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2001 (2016). Under § 3729, material means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." § 3729(b)(4). In this case, the "other party's course of action" is the Government's decision to reimburse at a particular price point.

Rite Aid argues that Relator has not pled materiality because the SAC fails to "identify a single instance in which Rite Aid's alleged noncompliance with U&C rules actually 'caused Medicare Part D and the federal-state Medicaid program . . . to pay excessive amounts.'" ECF 55, PgID 703 (quoting SAC ¶ 116). Rite Aid reasons that because all but two of the Relevant States pay claims "based on the lower of U&C and one or more other price metrics," the SAC must (but does not) allege that "the Rx Savings club price was actually lower than the alternative pricing benchmarks[.]" *Id.* at 703–05.

The argument fails. Neither party disputes that the U&C price is a factor in determining how much CMS will reimburse pharmacies—and they could not. *See* 42 C.F.R. § 447.512(b) (limiting the Government's payments to the lower of a pharmacy's actual acquisition cost and fees, or the U&C). Conceivably, in some cases another relevant pricing benchmark could render the U&C inapplicable to any given reimbursement. But that inapplicability would not always be the case—which is why the various states look to the lower of the two prices. All that relator must plead is that inflating the U&C would have the "natural tendency to influence, or be capable of influencing," the amounts reimbursed by CMS. The SAC satisfies the requirement.

14

IV.  Plaintiff's California Claims and Supplemental Jurisdiction

Rite Aid also argues that the SAC fails to state an FCA claim as to California due to statutes and litigation unique to that state. The argument revolves around a now-dissolved injunction that enjoined enforcement of part of California's law on Medicare reimbursements. *See Cal. Pharmacists Ass'n. v. Maxwell-Jolley*, No. 09-8200 (C.D. Cal. May 5, 2010) (ECF 55-2). The plaintiff pharmacies in the case challenged 2009 statutory revisions that resulted in cuts to reimbursements and they moved for, and received, an injunction. Among other things, the affected portions of the statute required pharmacies to submit their U&C when billing the state program and to keep records of their U&C for three years following the date they rendered service. *See* ECF 55-2, PgID 718 (citing Cal Wel. & Inst. § 14105.455 (2009)). The injunction was in place from May 5, 2010 to July 5, 2016. Rite Aid suggests that because the injunction made California's U&C requirements unenforceable, Relator's FCA claims arising in California during the pendency of the injunction are not actionable. In support, Rite Aid relies on a short, California state-court order that dismissed a similar qui tam case brought under California's version of the FCA. *See* ECF 55-5.

The Court doubts the soundness of the argument, in light of both the limits of the injunction and the unaffected federal requirements concerning U&Cs. But it need not analyze the matter now. Relator's claims both predate and postdate the injunction, so there are no grounds to dismiss his California claims at this early date.

**ORDER**

**WHEREFORE**, it is hereby **ORDERED** that Defendant's Motion to Dismiss [55] is **DENIED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiff is granted leave to **FILE** an amended complaint no later than 30 days from that date of this order. If Plaintiff fails to timely file an amended complaint, the Court will deem the failure as an admission that the deficiencies of the SAC identified in this Opinion are incurable and will therefore dismiss the case with prejudice and without further notice.

**SO ORDERED**.

s/Stephen J. Murphy, III  
STEPHEN J. MURPHY, III  
United States District Judge

Dated: April 11, 2018

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on April 11, 2018, by electronic and/or ordinary mail.

s/David P. Parker  
Case Manager