# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

---

**UNITED STATES OF AMERICA ex rel. AZAM RAHIMI, STATE OF CALIFORNIA ex rel. AZAM RAHIMI, STATE OF COLORADO ex rel. AZAM RAHIMI, STATE OF CONNECTICUT ex rel. AZAM RAHIMI, STATE OF DELAWARE ex rel. AZAM RAHIMI, DISTRICT OF COLUMBIA ex rel. AZAM RAHIMI, STATE OF GEORGIA ex rel. AZAM RAHIMI, STATE OF INDIANA ex rel. AZAM RAHIMI, STATE OF LOUISIANA ex rel. AZAM RAHIMI, STATE OF MASSACHUSETTS ex rel. AZAM RAHIMI, STATE OF MICHIGAN ex rel. AZAM RAHIMI, STATE OF NEVADA ex rel. AZAM RAHIMI, STATE OF NEW JERSEY ex rel. AZAM RAHIMI, STATE OF NEW YORK ex rel. AZAM RAHIMI, STATE OF NORTH CAROLINA ex rel. AZAM RAHIMI, STATE OF RHODE ISLAND ex rel. AZAM RAHIMI, STATE OF TENNESSEE ex rel. AZAM RAHIMI, STATE OF VIRGINIA ex rel. AZAM RAHIMI, and STATE OF WASHINGTON ex rel. AZAM RAHIMI.**

**Plaintiffs,**

**v.**

**RITE AID CORPORATION**

**Defendant.**

---

**3rd AMENDED COMPLAINT**
**CIVIL ACTION NO. 11-11940**
**(Judge Stephen J. Murphy)**
**(Magistrate Judge Mark A. Randon)**

**JURY TRIAL REQUESTED**

## THIRD AMENDED COMPLAINT
### (False Claims Act)

## SUMMARY STATEMENT

1.      This lawsuit involves hundreds of millions of dollars in false claims that the Defendant, Rite Aid Corporation ("Rite Aid"), has submitted to the federal Medicare Part D program, TRICARE (previously known as CHAMPUS), other federal programs such as the Federal Employee Health Benefits Plan ("FEHBP"), and the federal-state Medicaid programs in the plaintiff states of California, Colorado, Connecticut, Delaware, Georgia, Indiana, Louisiana, Massachusetts, Michigan, Nevada, New Jersey, New York, North Carolina,  Rhode Island, Tennessee, Virginia, and Washington, in the plaintiff District of Columbia (collectively referred to herein as "the state plaintiffs") and in the other states in which Rite Aid does business.  This lawsuit also involves millions of dollars in false claims to New York's Program for the Elderly.

2.      When pharmacies bill for medications provided to enrollees in the Medicare Part D prescription drug benefit program, they bill private entities that are administering the program under contract with the United States Government, using funds provided or reimbursed by the United States.  These private entities typically require pharmacies to bill no more than their usual and customary charge to the general public.

3.      In each of the plaintiff states, and in the remaining states in which Rite Aid pharmacies are found, Medicaid billing rules have required pharmacies to charge Medicaid their usual and customary prices to the general public, taking into account any discounted prices that the pharmacy makes available to the general public.

4.      New York State's Program for Elderly Pharmaceutical Insurance Coverage has required pharmacies to charge the program no more than their "usual and customary charge to the general public, taking into consideration any quantity and promotional discounts to the

general public at the time of purchase." NY CLS Elder § 250. The "usual and customary charge" billing rule has often been found in state health insurance program rules.

5.      In knowing violation of the billing rules of Medicare Part D, Medicaid, and other federal and state health insurance programs that have required pharmacies to bill their "usual and customary charge to the general public," since approximately September 2007, Rite Aid has charged the Medicare Part D program, Medicaid and these federal and state health insurance programs prices that significantly exceed the prices that Rite Aid has routinely offered customers through its "Rx Savings" discount program. For certain generic medications, the prices Rite Aid has charged these government health insurance programs have been six to twelve times greater than the prices Rite Aid has charged under its Rx Savings discount program.

6.      Qui Tam Plaintiff Azam Rahimi ("Rahimi" or "Relator"), a pharmacist with an interest in public health policy, brings this civil action on behalf of and in the name of the United States of America ("United States") under the qui tam provisions of the federal False Claims Act, 31 U.S.C. §§ 3729-3733, and on behalf of and in the name of the state plaintiffs under analogous qui tam provisions in state false claims laws.

## JURISDICTION AND VENUE

7.      All Counts of this Complaint are civil actions by Relator, acting on behalf of and in the name of the United States and the state plaintiffs, against the Defendant under the federal False Claims Act, 31 U.S.C. §§ 3729-3733, and analogous state false claims laws.

8.      This Court has jurisdiction over the claims brought on behalf of the United States pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. § 3732(a).

9.      This Court has supplemental jurisdiction over the claims brought on behalf of the state plaintiffs under 28 U.S.C. § 1367.  In addition, the Court has jurisdiction over the state law claims alleged herein under 31 U.S.C. § 3732(b).

10.     Defendant Rite Aid transacts business in this judicial district.  In addition, Defendant has violated the federal False Claims Act in this judicial district as a result of the misconduct alleged herein.  Accordingly, this Court has personal jurisdiction over the Defendant, and venue is appropriate in this district.  The False Claims Act provides that any action under 31 U.S.C. § 3730 may be brought "in any judicial district in which . . . any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred."  31 U.S.C. § 3732(a).  Venue is also proper under 28 U.S.C. § 1391.

11.     None of the allegations set forth in this Complaint is based on a public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative or General Accounting Office report, hearing, audit or investigation, or from the news media.  Relator Azam Rahimi has direct and independent knowledge of the information on which the allegations set forth in this Complaint are based.  Moreover, prior to filing this lawsuit and prior to any public disclosures regarding this matter, Relator voluntarily provided the information set forth herein to agents of the United States Department of Justice and the state plaintiffs.

## THE PARTIES

### Relator Azam Rahimi

12.     Azam Rahimi was born in Elmhurst, NY, on January 29, 1983.  In 2007, he received his doctorate in Pharmacy from St. John's University in Jamaica, NY.  Upon graduation, he worked as a pharmacy intern and a pharmacist at Walgreens Pharmacy in New

York, NY, and Warrenton, VA.  He left Walgreens in September 2009 to open an independent pharmacy in Woodbridge, VA.  In November 2009, he also began working from his home for Medco Pharmacy, verifying prescriptions, performing drug utilization and interaction review and overseeing quality control.  In August 2010, Relator closed his independent pharmacy in order to have more time for his Medco Pharmacy responsibilities.  He left Medco in 2012, and since then has been employed as a pharmacist at Target Pharmacy, first in Woodbridge, VA and now in Alexandria, VA.  CVS Pharmacy, Inc. acquired the Target pharmacies in 2016.

**Plaintiff United States of America**

13.     Relator Azam Rahimi brings this action on behalf of the United States pursuant to the qui tam provisions of the federal False Claims Act, 31 U.S.C. § 3729 et seq.

14.     The United States of America, acting through the Centers for Medicare and Medicaid Services ("CMS") of the U.S. Department of Health & Human Services ("HHS"), oversees and provides the large majority of the funding to the Medicare Part D program, which is a voluntary prescription drug benefit program that is available to those eligible for Medicare, i.e., those 65 years and older, the disabled and those with End Stage Renal Disease, who are willing to pay premium payments, co-insurance or co-payments, and accept other terms of the plan. CMS contracts with private insurance companies in order to provide Medicare Part D coverage to beneficiaries.

15.     The United States of America, acting through CMS, oversees and reimburses the states for a portion of their expenditures for the joint federal-state Medicaid program.  Medicaid, a health insurance program for the financially needy, was established under Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq., and state laws.

16.     The United States of America, acting through the Department of Defense, oversees and provides funding to the TRICARE program, 10 U.S.C. § 1071 et seq., which is a comprehensive health and prescriptions benefits plan for active duty and retired service members and their eligible beneficiaries.   On behalf of the United States, Relator seeks to recover for damages resulting from false claims submitted to the Medicare Part D program and to the federal-state Medicaid drug benefit program.

### State Plaintiffs

17.     Relator brings this action on behalf of the states of California, Colorado, Connecticut, Delaware, District of Columbia, Georgia, Indiana, Louisiana, Massachusetts, Michigan, Nevada, New Jersey, New York, North Carolina, Rhode Island, Tennessee, Virginia, and Washington.  He brings this action under the qui tam provisions of the following false claims laws of the state plaintiffs:   California False Claims Law, Cal. Gov. Code § 12650 et seq.; Colorado Medicaid False Claims Act, Col. Rev. Stat. § 25.5-4-303.5 et seq. (effective July 1, 2010); Conn. Gen. Stat. § 17b-301d (2010); Delaware False Claims and Reporting Act, 6 Del. Code § 1201 et seq.; District of Columbia False Claims Act, D.C. Code § 2-381.01 et seq.; Georgia State False Medicaid Claims Act, Georgia Code, Title 49, Ch. 4, Art. 7B; Indiana False Claims & Whistleblower Protection Law, Ind. Code § 5-11-5.5.-1 et seq.; Louisiana's Medical Assistance Programs Integrity Law, La. Rev. Stat. § 46:437.1 et seq.; Massachusetts False Claims Law, ALM Ch. 12 § 5A-0 et seq.; Michigan Medicaid False Claims Act, Mich. Code 400.601 et seq.; Nevada's False Claims Act, Nev. Rev. Stat. § 357.010 et seq.; New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 et seq. (effective March 13, 2008);  New York False Claims Act, NY Finance Law, Art. 13, § 187 et seq.; North Carolina's False Claims Act, N.C. Gen. Stat. § 1-605 et seq. (effective January 1, 2010); Rhode Island False Claims Act, R.I. Gen. Laws § 9-

1.1-1 et seq. (2010); Tennessee Medicaid False Claims Act, Tenn. Code § 71-5-181 et seq.; Virginia Fraud Against Taxpayers Act, Va. Code § 8.01-216.1 et seq.; and Washington's Medicaid Fraud False Claims Act, Wash. Code § 74.66.005 et seq. (effective June 7, 2012).

18.     The state plaintiffs participate in the Medicaid program under which, under certain circumstances, they pay the costs of providing pharmaceutical drugs to indigent persons who are the beneficiaries of the program.  The Medicaid program agencies of the state plaintiffs pay pharmacies for medications on behalf of Medicaid beneficiaries.  The state plaintiffs then seek reimbursement for a portion of these expenditures from the federal government.

19.     The state plaintiffs also independently fund other health insurance programs, such as New York's Program for Elderly Pharmaceutical Insurance Coverage, that require pharmacies to charge the state program their "usual and customary charges" to the general public.

20.     On behalf of the state plaintiffs, Relator seeks recovery for damages caused by the submission of false claims to state-funded health insurance programs, including but not limited to the federal-state Medicaid programs that are jointly funded by the United States and the state plaintiffs.

### Defendant Rite Aid Corporation

21.     Defendant Rite Aid is the third largest retail drugstore chain in the United States, based on revenues and number of stores.  In 2011, Rite Aid had 4,780 stores in 31 states and the District of Columbia.  The company is headquartered in Camp Hill, PA, and incorporated in Delaware.  In 2009, its revenues exceeded $25 billion, and in the fiscal year ending February 28, 2015, its revenues exceeded $26 billion, with $18.1 billion of this amount attributable to sales of prescription medication.   Rite Aid pharmacies dispense prescription medications in Michigan as well as in each of the other states named as plaintiffs herein.

**MEDICAID AND MEDICARE PART D BILLING REQUIREMENT:
"USUAL AND CUSTOMARY CHARGE TO THE GENERAL PUBLIC"**

**Medicaid Usual and Customary Requirement**

22.     As a condition of a state's obtaining federal reimbursement for a portion of the state's Medicaid expenditures, the federal government requires each state to comply with a number of specific requirements that are set forth in federal regulations.  One of these federal requirements relates to the appropriate reimbursement for pharmaceutical drugs.  The federal government will not reimburse a state for its Medicaid expenditures for prescription drugs unless the state complies with certain payment limits.  To get federal reimbursement, the state must pay no more than the dispensing pharmacy's "usual and customary charge to the general public" for the drug.  42 C.F.R. § 447.332(b).

23.     To comply with the federal regulation described in the preceding paragraph, state Medicaid programs have enacted rules that require pharmacies to bill Medicaid no more than their "usual and customary charge to the general public" for prescription drugs.  The states have enacted these rules in statutes, regulations and/or manuals that set forth instructions for pharmacies billing Medicaid.  The states have required providers, including pharmacies, that bill Medicaid to certify that they will comply and are in compliance with Medicaid program rules and instructions.

24.     Since October 2003, federal law has mandated that pharmacies submitting claims electronically to Medicaid and all other payers use a standard claim format for electronic transactions published by the National Council for Prescription Drug Programs ("NCPDP"), a pharmaceutical industry group that has promoted standardization in the pharmaceutical industry since 1977.  *See* 45 C.F.R. § 162.1102(a)–(c) (adopting the NCPDP standard as the mandatory

standard for retail pharmacy electronic drug claims under the Health Insurance Portability and
Accountability Act of 1996 ("HIPAA")).

25.     The NCPDP's standard format includes a field for "usual and customary charge"
which the format's instructions define to mean the "[a]mount charged cash paying customers for
the prescription exclusive of sales tax or other amounts claimed."   *See NCPDP Reference
Manual*, Ch. 3, p. 72 (Rev. Oct. 2005), *available at* http://www.cms.gov/Medicare/Billing/
ElectronicBillingEDITrans/downloads/ NCPDPflatfile.pdf.   The NCPDP designates this field as
"optional," meaning that it must be filled out by the pharmacy only if required by the payer.   *See,
e.g.*, Arkansas Medicaid, *NCPDP Payer Sheet Version D.0*, at 16 (Oct. 18, 2011), *available at*
https://www.medicaid.state.ar.us/download/provider/hipaa/ncpdp_d0_payer.doc      (stating     that,
under the NCPDP Telecommunications Standard Implementation Guide, this field is "[r]equired
if needed per trading partner agreement").

26.     With the exception of California, the states in which Defendant has operated
stores require a pharmacy billing the state Medicaid program to complete the "usual and
customary" field in the standard NCPDP format so as to represent to Medicaid the "[a]mount
charged cash paying customers for the prescription exclusive of sales tax or other amounts
claimed."   *See, e.g.,* Mississippi Medicaid Fee for Service, *Request Claim Billing/Claim Rebill
(B1/B3) Payer Sheet*, at 3 (August 2013), *available at* http://www.medicaid.ms.gov/wp-
content/uploads/2014/04/MS-NCPDP.pdf;  New Jersey Medicaid, *D.0/1.2 Payer Sheet*, at 34
(October      2014),      *available      at*      http://www.njmmis.com/downloadDocuments/NJ_D-
0_NCPDP_Payer_Sheet.pdf; TennCare, *TennCare D.0 Payer Specification*, at 9 (Mar. 2013),
*available at* http://sites.magellanhealth.com/media/353755/tncpayerspec.pdf.   While California
doesn't require completion of this field, it requires pharmacies to bill Medicaid a "Gross Amount

Due" field, which California defines as, "the combination of ingredient cost and dispensing fee that reflects the lower of (1) the lowest price reimbursed to the pharmacy by other third-party payers in California, excluding Medi-Cal managed care plans and Medicare Part D prescription drug plans and (2) the lowest price routinely offered to any segment of the general public." California Department of Health Care Services, Pharmacy FAQs, available at https://files.medi-cal.ca.gov/pubsdoco/ncpdp/ncpdp_faq.asp.

27.     The states that participate in Medicaid have referenced, and in some cases have defined, the term "usual and customary charge to the general public" (hereinafter referred to as the "usual and customary charge" or "U&C charge") in statutes, rules and/or program manuals, so that pharmacies can understand how to compute their charges to Medicaid.  The Medicaid Program of each state has required pharmacies to bill Medicaid no more than the price that the pharmacy usually and customarily makes available to members of the general public, a term that necessarily includes Defendant's Rx Savings Program price for generic medications.

## California

28.     California's Medicaid program ("Medi-Cal") has defined the term "usual and customary charge" to be the lower of the following:  "(1) The lowest price reimbursed to the pharmacy by other third-party payers in California, excluding Medi-Cal managed care plans and Medicare Part D prescription drug plans, (2) The lowest price routinely offered to any segment of the general public."  Cal. Wel. & Inst. Code [Welfare and Institutions Code] § 14105.455 (2009).

29.     In California, regulations have been in effect since the 1960s that place similar limitations on the amount that pharmacies may bill to Medi-Cal for prescription drugs. Specifically, Title 22, California Code of Regulations, section 51480 prohibits pharmacies from

billing or submitting "a claim for reimbursement for the rendering of health care services to a Medi-Cal beneficiary in any amount greater or higher than the usual fee charged by the provider to the general public for the same service."   22 Cal. Code Reg. § 51480.   And, Title 22, California Code of Regulations, section 51501 prohibits pharmacies from charging the Medi-Cal program "for any service or any article more than would have been charged for the same service or article to other purchasers of comparable services or articles under comparable circumstances."   22 Cal. Code Reg. § 51501.   In Medi-Cal's provider agreements, pharmacies participating in Medi-Cal have agreed as a "condition precedent to payment" to comply with all "federal laws and regulations governing and regulating Medicaid providers" and, specifically, with all of the billing and claims requirements in the California Welfare and Institutions Code and implementing regulations.   *See, e.g.*, DHCS Form 6208, *Medi-Cal Provider Agreement*, && 2, 25, and general agreement on p. 8 (rev. 2/08), available at https://files.medi-cal.ca.gov/pubsdoco/Publications/   masters-other/provappsenroll/02enrollment_DHCS6208.pdf (accessed June 18, 2016).   The instructions to the Medi-Cal pharmacy claim forms have instructed pharmacies to include their "usual and customary charge" in the "charge" field.

### Colorado

30.   Through 2008, Colorado required pharmacies seeking reimbursement from Medicaid to bill Medicaid "the lesser of the provider's usual and customary charge or any amount the provider will accept from any other third party program or from the public in the form of discounts, special rebates, incentives, or coupons."   10 CCR § 2505-10, 8.800 (2008) (effective Jan. 1, 2006).

31.   From 2009, Colorado has required pharmacies to bill Medicaid their "usual and customary charge," a term the regulations defined as "the reimbursement amount the provider

charges the general public to pay for a drug."  10 CCR § 2505-10, 8.800.1 (2016) (effective June 30, 2009).

**Connecticut**

32.     Connecticut's Medicaid regulations limit the amount that pharmacies may charge Medicaid for prescription drugs to "the average wholesale price per 100, pint or package, as indicated in the Red Book, plus the applicable professional fee, or the [estimated acquisition cost] plus the applicable professional fee, or the usual and customary charge to the general public whichever is lower."  Regs., Conn. State Agencies § 17-2-97 (eff. September 26, 1978).

33.     Pursuant to the rules of the Connecticut Medicaid program ("Connecticut Medical Assistance Program"), "'Usual and Customary Charge to the General Public' has meant a charge which will be made for the particular prescription by the provider to the patient group accounting for the largest number of non-Medicaid prescriptions."  *Provider Manual, Chapter 7 – Pharmacy* (January 1, 2008), Section 174.A.XXI, p. 3, underline available at https://www.ctdssmap.com/CTPortal/ Information/Publications/tabid/40/Default.aspx (accessed June 17, 2016).  In a July 2010 Policy Transmittal, the state notified pharmacies participating in Connecticut's Medical Assistance Program that:

> a pharmacy provider enrolled in any medical assistance program administered by the Department of Social Service, when billing the department for a good or service, shall bill the department the lowest amount accepted from any member of the general public who participates in the pharmacy provider's savings or discount program.
>
> . . . To comply with the law, pharmacies must charge the department the lowest amount accepted from participants in the applicable discount programs.  This can be achieved by reporting the lowest charge as the 'usual and customary' charge on the claim submission.   Pharmacies are also required to refund to the department any excess payments received for claims billed from May 7th forward that do not properly reflect the lowest charge.

PB10-42.

34.     In the Connecticut Provider Enrollment Agreement, pharmacies have agreed that they will abide by the Connecticut Medical Assistance Program Manuals, that they will bill in accordance with the rates and amounts established by the Connecticut Medical Assistance Program and that they will immediately repay to the Connecticut Medical Assistance Program any excessive payments they receive. *Provider Enrollment Agreement*, Connecticut Department of Social Services, Health Care Financing, && 10, 13 and 32, available at www.ct.gov/dss/lib /dss/chcp/exhibit_1_dss-medicaid-provider-enrollment-agreement.doc (accessed June 18, 2016). The Connecticut Medical Assistance Program claim form has included a field for the provider's "usual and customary charge."

### Delaware

35.     From at least 2007 through the current time, the Delaware Pharmacy Billing Manual has defined "usual and customary charge" as the "[a]mount charged cash customers for the prescription exclusive of sales tax or other amounts claimed." *Pharmacy Billing Manual*, rev. 12/1/14, § 2.3.2, available at http://www.dmap.state.de.us/downloads/manuals/ Pharmacy.Billing.pdf (accessed June 18, 2016).

### District of Columbia

36.     The regulations of the Medicaid Program for the District of Columbia provide that "[p]harmacy claims for a community or retail pharmacy provider shall be reimbursed at the lower of" the "[t]he allowable cost, established pursuant to . . . , as appropriate, plus a dispensing fee of four dollars and fifty cents ($ 4.50) per prescription," or "[t]he pharmacy's usual and customary charge to the general public." CDCR 29-2710.5(a)-(b) (eff. October 3, 2013).

37.    The pharmacy "payer sheet" in the D.C. Pharmacy Benefits Management Prescription Drug Claims System (X2) Provider Manual requires pharmacies billing D.C.'s Medical Assistance Program to provide the "usual and customary charge" in Field 426-DQ of the form.  *D.C. Pharmacy Benefits Management Prescription Drug Claims System (X2) Provider Manual*, Version 0.11 (01/01/2013), Ch. 7, DC DHCF Payer Specifications, p. 25, <u>available at</u> http://www.dcpbm.com/documents/DC%20MAA%20Provider%20Manual%20v100412.pdf (accessed March 2013).

## Georgia

38.    The Medicaid program of the State of Georgia ("Georgia's Medical Assistance Program") has defined the "usual and customary charge to the general public" to be "the lower of the lowest price reimbursed to the pharmacy by other third party payers (including HMO's); or, the lowest price routinely offered to any segment of the general public.  For example, if a pharmacy offers discounts to Senior Citizens or children, the same discounted price must be billed to the Division."  *Provider Manual, Part II:  Policies and Procedures for Pharmacy Services* (April 2016), Section 1001, p. X-2, available at https://www.mmis.georgia.gov /portal/Portals/0/StaticContent/Public/ALL/HANDBOOKS/April%202016%20- %20Final%20Version%20(002)%2001-04-2016%20165259.pdf (accessed June 18, 2016).

39.    Providers participating in the Georgia Medical Assistance Program have agreed to comply with all legal requirements applicable to the program, including those set forth in the Provider Manuals.  Form DMA-002, *Statement of Participation*, Department of Community Health, Division of Medical Assistance, & 2A, available at https://www.gahsc.org/nm/pp/ 2006/ccs/Medicaid%20Provider%20Enrollment%20Appl.pdf (accessed June 18, 2016).   The

Georgia Medical Assistance pharmacy claim form has contained a field in which pharmacies are asked to state their "usual and customary charge."

### Indiana

40.    Indiana's Medicaid regulations specifically limit the reimbursement to pharmacies to no more than "[t]he provider's submitted charge, representing the provider's usual and customary charge for the drug, as of the date of dispensing."  405 IAC 5-24-4(a)(3) (2016) (effective July 25, 1997).

41.    In Indiana, the state Medicaid agency has specified that a pharmacy's usual and customary charge to the general public must include "any special pricing (for example, $4 generic programs) for the covered service."  *Indiana Health Coverage Programs Provider Reference Module, Pharmacy Services* (February 25, 2016), p. 12, available at http://provider.indianamedicaid.com/media/155565/pharmacy%20services.pdf  (accessed  June 18, 2016).  When enrolling in Indiana Medicaid, pharmacies have been required to certify that they will abide by the provider program manual, as amended from time to time, and that they will bill Medicaid in amounts no greater than their usual and customary charge to the general public.  *IHCP Provider Agreement*, Indiana Health Coverage Programs, && 12 and 13, available at  http://www.indianamedicaid.com/ihcp/providerservices/pdf/provideragreement.pdf  (accessed June 18, 2016).  The Indiana Medicaid pharmacy claim forms have requested that pharmacies identify their "usual and customary charge" in the "charge" field.

### Louisiana

42.    Louisiana law requires that all claim forms submitted by health care providers, including pharmacies, certify that "the amount billed does not exceed the health care provider's

usual and customary charge for the same goods, services, or supplies." La. R.S. § 46:437.13(A)(2) (2016) (effective August 15, 1997).

43.     In its Medicaid Program Provider Manual, Louisiana informs pharmacies billing the state Medicaid program that: "[f]ederal regulations governing the Medicaid Program require that participating providers agree to charge no more for services to eligible recipients than they charge for similar services to the general public." Louisiana then defines the term "general public" as "all other non-Medicaid prescriptions including third-party insurance, pharmacy benefit management plans and cash." *Louisiana Medicaid Program Provider Manual*, Ch. 37: Pharmacy Benefits Management Services, rev.01/01/12, p. 6-3, <u>available at</u> http://www.lamedicaid.com/provweb1/manuals/pharm_benefits_manual.pdf (accessed June 18, 2016).

## <u>Maryland</u>[1]

44.     Maryland's Code of Regulations provides that "[t]he pharmacy provider shall charge the Program his usual and customary charge to the general public for similar prescriptions." COMAR 10.09.03.07(F) (2016) (effective December 27, 2004).

## <u>Massachusetts</u>

45.     The Medicaid Program in Massachusetts ("MassHealth") has defined the term "usual and customary charge" as "the lowest price that a pharmacy charges or accepts from any payer for the same quantity of a drug on the same date of service, in Massachusetts, including but not limited to the shelf price, sale price, or advertised price of an over-the-counter drug." *Provider Manual Series, Pharmacy Manual* (September 15, 2008), p. 4-3, available at

---

[1] Although Maryland is no longer a plaintiff state, Relator seeks to recover the federal government's share of the false claims submitted to Maryland Medicaid.

http://www.mass.gov/eohhs/docs/masshealth/regs-provider/regs-pharmacy.pdf   (accessed   June
18, 2016).

46.     In Massachusetts, pharmacies have agreed that "the submission of any claim by or
on behalf of the provider constitutes a certification (whether or not such certification is
reproduced on the claim form) that . . . the payment claimed does not exceed the maximum
amount payable in accordance with the applicable fees and rates or amounts established under a
provider contract or regulations applicable to MassHealth payment."     130   CMR
450.223(C)(2)(c) (effective April 1, 2003).  MassHealth has required pharmacies to use online
claims submission software that contains a mandatory "usual and customary charge" field.

### Michigan

47.     The State of Michigan's Medicaid Program has made explicit that the "usual and
customary charge" must include "advertised discounts, special promotions, or other programs to
initiate reduced prices made available to the general public or a similar portion of the
population." *Medicaid Provider Manual, General Information for Providers* (January 1, 2011),
Section 12.2, p. 35, available at http://www.mdch.state.mis.us/dch-medicaid/manuals/Medicaid
ProviderManual.pdf (accessed June 18, 2016).

48.     Pharmacies enrolling in Michigan Medicaid have agreed to read and comply with
the provider manual and to comply with all conditions of participation, policies and procedures
stated therein and in updates, provider bulletins and other program notifications.  Form MSA-
1626, *Pharmacy Provider Enrollment and Trading Partner Agreement*, Michigan Department of
Community Health (rev. 04/11), & 6, <u>available at</u> https://michigan.fhsc.com/Downloads/
RxEnrollment_MSA1626-20110427.pdf (accessed June 18, 2016).  Pharmacies specifically have
agreed to comply with Michigan's policies and practices applicable to billing Medicaid and to

reimburse any overpayments.  *Id.*, & 13.  Michigan's pharmacy claims form has contained a field in which the pharmacy must state its "usual and customary charge."

### Nevada

49.     In Nevada, "[a] pharmacy may not bill Medicaid more than the general public." *Medicaid Services Manual*, rev. 10/1/2015, Addendum, Sec. U, p. 2, available at http://dhcfp.nv.gov/uploadedFiles/dhcfpnvgov/content/Resources/AdminSupport/Manuals/MSM /MSMAddendum/MSM_Addendum_16_5_13.pdf (accessed June 18, 2016).  Nevada's Medicaid Services Manual defines the term "general public" for purposes of the "usual and customary charge" billing rule as "the patient group accounting for the largest number of non-Medicaid prescriptions from a pharmacy," excluding "patients who purchase or receive prescriptions through third party payers such as Blue Cross, Aetna, PAID, PCS, etc."  *Id.* Sec. G, p. 1. Nevada's Medicaid Services Manual further mandates that: "[i]f a pharmacy discounts prices to specified customers, (e.g. 10% discount to senior citizens) these lower prices should be excluded from usual and customary calculations unless they represent more than 50% of the store's prescription volume."  *Id.*

### New Hampshire[2]

50.     The State of New Hampshire's Medicaid program requires pharmacies to charge Medicaid no more than their "usual and customary charge" and defines the term "usual and customary" to mean "the lowest charge, fee, or rate charged by a provider for any product or service at the time such product or service was provided.  For the purpose of determining the lowest charge, fee or rate:  1) If the provider offers discounts or rebates, then the amount after

---

[2] Although New Hampshire is no longer a plaintiff state, Relator seeks to recover the federal government's share of the false claims submitted to New Hampshire Medicaid.

applying discounts or rebates shall be utilized."  N.H. Rev. Stat. Ann. 126-A:3(III)(a) and (b) (eff. November 1, 1995).

51.    In the New Hampshire Medicaid Provider Agreement, pharmacies have been required to agree to the following:  "my charges for services or items delivered to NH Title XIX [Medicaid] recipients will not exceed my fees or charges for similar services or items delivered to persons not entitled to receive benefits under the NH Title XIX Program."  *New Hampshire Medicaid Program Provider Participation Agreement*, State of New Hampshire, Department of Health      &      Human      Services,      available      at 04c21d804ac7509c8aa9dfa36af9e3a5/Provider+Agreement+v.06+20120328.pdf?MOD=AJPER ES (accessed June 18, 2016).  In addition, they have been required to commit that they will "abide by all rules, regulations, billing manuals, bulletins, and notices promulgated by the US Department of Health and Human Services, the State of NH, or the NH Department of Health and Human Services pertaining to the provision of care or services under NH Title XIX and the claiming of payment for those services."  *Id.*  New Hampshire's paper and electronic claims for pharmacies billing Medicaid have required pharmacies to state their "usual and customary charge."

## New Jersey

52.    The New Jersey Administrative Code provides that "[t]he maximum charge to the New Jersey Medicaid or NJ FamilyCare program for drugs, including the charge for the cost of medication and the dispensing fee, shall not exceed the provider's usual and customary and/or posted or advertised charge."  N.J.A.C. 10:51-1.5(c) (effective June 16, 1997).  New Jersey defines the term "usual and customary charge to the general public" as "the amount a provider charges the general public for a prescription for the same drug product (same NDC number) in

the same quantity as the prescription being dispensed to a Medicaid or NJ FamilyCare beneficiary" and "the actual charge made to the majority (51 percent) of the total patient population served by the individual pharmacy." N.J.A.C. 10:51-1.10(a)-(b) (effective September 21, 1998). New Jersey's Medicaid regulations provide the following, specific direction on how to apply New Jersey's "usual and customary charge" billing rule:

> "Usual and customary charge" means . . . .
>
> 1. The provider shall not charge the programs more than would be charged to a cash customer when the general public, including private third party plans, accounts for more than 50 percent of a provider's total prescription volume.
>
> i. In the event Medicaid, NJ FamilyCare and/or PAAD represent more than 50 percent of a provider's total prescription volume, then, for reimbursement purposes, the provider's usual and customary charge may be considered the amount the programs would reimburse for the same services.

*Id.*

## New York

53.     The State of New York's Medicaid program has stated that it would not reimburse an amount greater than a pharmacy's "usual and customary charge to the general public." www.health.state.ny.us/health_care/medicaid/program/docs/pharmacyreimbursement. Pharmacy providers have been instructed to enter their "usual and customary charge" in the "charge" field of the claim form used to bill Medicaid.

54.     New York State's Program for Elderly Pharmaceutical Insurance Coverage has required pharmacies to charge the program no more than their "usual and customary charge to the general public, taking into consideration any quantity and promotional discounts to the general public at the time of purchase." NY CLS Elder § 250(1)(a)(1) (eff. October 6, 2004).

## North Carolina

55.     The North Carolina Administrative Code directs that "[r]eimbursement for outpatient prescription drugs dispensed to [Medicaid] enrollees shall be made to the pharmacy provider of service at a rate not to exceed the lesser of: (1) the applicable North Carolina Medicaid Pharmacy Program reimbursement rate; or (2) the pharmacy provider's usual and customary charge."  10A N.C.A.C. 39A.1307(a)(1)-(2) (effective April 1, 2001).

## Rhode Island

56.     The State of Rhode Island's Medicaid program ("Rhode Island Medical Assistance") has defined a pharmacy's "usual and customary charge" to be "the lowest charge, fee, or rate charged by a provider for any product or service at the time such product or service was provided."  R.I. Gen. Laws § 40-8-4.1(b) (effective July 1, 2009).  As does New Hampshire's, Rhode Island law has further provided that:  "[f]or the purpose of determining the lowest charge, fee, or rate:  (1) If the provider offers discounts or rebates, the amount after applying discounts or rebates shall be utilized."  *Id.*

57.     On Rhode Island's Medicaid Provider Agreement, pharmacies have agreed "[t]o follow all laws, rules, regulations . . . that govern the Rhode Island Medical Assistance Program."  *Provider Agreement Form*, State of Rhode Island, Department of Human Services (updated Jan. 2011), & 1, available at http://www.eohhs.ri.gov/Portals/0/Uploads/Documents/ prov_agreement.pdf (accessed June 18, 2016).  They have further agreed "[t]o bill the RI Medical Assistance Program in accordance with State and Federal regulations and laws, but in no event more than the provider's usual, customary and reasonable rate charged to the general public for all services, goods, and products provided to Medical Assistance beneficiaries."  *Id.*, &

11.   Rhode Island's Medical Assistance Claim Form for pharmacies has contained a field requesting the pharmacy's "usual and customary charge."

## Tennessee

58.   The TennCare Pharmacy Manual requires pharmacies participating in TennCare, which is Tennessee's managed Medicaid program, to bill TennCare their "usual and customary" charge  whenever it is less than the price determined using the other pricing methodologies set forth in the manual:

> 7.4.1 Provider Reimbursement Rates
>
> Pricing is always the "lesser of":
>
> - AWP – 15% + dispense fee for brand drugs; or
>
> - AWP – 13% + dispense fee for generic drugs; or
>
> - Federal MAC + dispense fee; or
>
> - TennCare MAC + dispense fee; or
>
> - Usual and Customary (U & C); or
>
> - Gross Amount Due

State of Tennessee Medicaid Pharmacy Claims Submission Manual (March 1, 2016), p. 30-31, available at https://tenncare.magellanhealth.com/static/docs/Program_Information/TN_Medicaid_Pharmacy_Claims_Submission_Manual_Final.pdf (accessed June 18, 2016).

59.   The TennCare Payer Specification Sheet requires that pharmacy providers input their "usual and customary" charge when submitting claims.  *Id.* at p. 45.

## Virginia

60.   The Virginia administrative code provides, with respect to fee-for-service pharmacy providers, that "[p]ayment for pharmacy services shall be the lowest of items 1

through 5 . . . . 3. The provider's usual and customary charge to the public, as identified by the claim charge." 12 VAC 30-80-40 (effective January 3, 2005).

61.     The Pharmacy Manual in Virginia states that "[p]roviders approved for participation in the Medicaid Program must perform the following activities as well as any others specified by [Department of Medicaid Assistance ("DMAS")]: . . . . Charge DMAS for the provision of services and supplies to recipients in amounts not to exceed the provider's usual and customary charges to the general public." *Pharmacy Manual*, Ch. II: Provider Participation Requirements, rev. 9/24/2012, p. 2, <u>available at</u> https://www.virginiamedicaid.dmas.virginia.gov/wps/portal/ProviderManual (accessed March 2013).

62.     In Virginia, "[r]equirements for pharmacy providers for participation include, but are not limited to: . . . . [s]ubmission of claims for drugs dispensed to Medicaid recipients for reimbursement by Medicaid based on the pharmacy's usual and customary charge to the public not to exceed the upper limits established by DMAS." *Id.* at p. 8.

63.     Furthermore, providers are instructed in the billing portion of the Pharmacy Manual that they "shall bill the Virginia Medicaid Program their usual and customary charges for all prescriptions dispensed." *Pharmacy Manual*, Ch. V: Billing Procedures, rev. 7/31/2015), p. 11 (emphasis in original), available at https://www.ecm.virginiamedicaid.dmas.virginia.gov/WorkplaceXT/getContent?vsId={63B6BDF3-F32B-46C8-9E28-884E65DC6AA0}&impersonate=true&objectType=document&id={DD4964AF-DF6E-498B-9194-7399C767BA7E}&objectStoreName=VAPRODOS1 (accessed June 18, 2016).

### Washington

64.     Washington State's Medicaid program reimburses pharmacies and other health care providers "on the basis of usual and customary charges or the maximum allowable fee

established by the department, whichever is lower." WAC § 182-502-0100(9) (effective August 17, 2000). For purposes of pharmacy reimbursement, Washington law defines the term "usual and customary charge" as "[t]he fee that the provider typically charges the general public for the product or service," WAC § 182-530-1050, with the term "general public" interpreted to mean "the nonmedicaid population." WAC § 182-530-7000. Pharmacies billing Washington Medicaid are instructed to bill their "usual and customary charge" and, in particular, "[i]f the pharmacy provider offers a discount, rebate, promotion or other incentive that directly relates to the reduction of the price of a prescription to the individual non-Medicaid customer, the provider must similarly reduce its charge to the Department for the prescription. (Example: A $5.00 off coupon for purchases elsewhere in the store.)." *Health Care Authority Prescription Drug Program: Billing Instructions*, p. H-2, available at http://www.hca.wa.gov/medicaid/billing/documents/guides/prescription_drug_program_bi_05092010_12312011.pdf (accessed June 18, 2016).

65.     Washington Medicaid's billing instructions informed pharmacies (other than Public Health Service entities) to enter in the "usual and customary charge" field of the National Council for Prescription Drug Program point-of-sale system claim form the "[a]mount charged cash customers for the prescription exclusive of sales tax." *Id*. at p. K.22.

### Medicare Part D Usual and Customary Requirement

66.     To meet the prescription drug needs of Medicare enrollees, in 2003, Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act ("MMA"). Pub. L. 108-173, 117 Stat. 2066 (2003). The MMA established a voluntary prescription drug benefit program known as Medicare Part D available to those eligible for Medicare, i.e., those 65 years and older, the disabled and those with End Stage Renal Disease, who are willing to pay premium

payments, co-insurance or co-payments, and accept other terms of the plan. To deliver Part D benefits to Medicare enrollees, CMS contracts with private insurance companies known as Part D Plan Sponsors ("Part D Sponsors"), which in turn offer enrollees a choice of prescription drug benefit plans. These plans must meet minimum standards set by CMS. *See* 42 U.S.C. § 1395w-102; 42 C.F.R. § 423.104.

67.     To fund the Part D prescription drug benefit, CMS pays a Part D Sponsor a per-enrollee subsidy (paid monthly) based on a bid submitted by the Part D Sponsor the previous year that reflected the Part D Sponsor's anticipated costs. 42 C.F.R. § 423.329(a). This direct subsidy is risk-adjusted to account for the health status of the particular Part D Sponsor's enrollees. 42 C.F.R. § 423.329(b). To provide Part D Sponsors with further protection against annual cost fluctuations, Part D also includes a risk-sharing mechanism (known as the "risk corridors") under which CMS will partially reimburse a Part D Sponsor if its actual costs exceed its anticipated costs by a specified percentage. *See* 42 C.F.R. § 423.336. Similarly, CMS provides additional funding to "reinsure" Part D Sponsors for prescription drug costs incurred after an enrollee reaches a specified threshold of out-of-pocket expenses (known as the "catastrophic" threshold). 42 C.F.R. § 423.329(c). And CMS provides further payments to subsidize costs incurred by certain low-income enrollees. 42 C.F.R. § 423.329(d). Thus, CMS's monthly subsidy payments may include a combination of reinsurance payments, low-income enrollee subsidies, and risk-sharing payments on top of the direct per-enrollee subsidy.

68.     At the end of each year, CMS "reconciles" the Part D Sponsor's actual allowable costs against the monthly subsidy payments to determine whether it must make further risk sharing, low-income subsidy, or reinsurance payments; or, conversely, whether the Part D Sponsor owes money to CMS. 42 C.F.R. §§ 423.329(c), 423.343. To calculate whether it must

make these additional payments, CMS needs information about every drug claim submitted to the Part D Sponsor by pharmacies, either directly or through a Pharmacy Benefit Manager ("PBM") or other intermediary.  42 C.F.R. §§ 423.329(c)(2)(ii), 423.336(c); *see also* Final Rule, Medicare Prescription Drug Benefit, 70 Fed. Reg. 4,194, 4,307 (Jan. 28, 2005).

69.    As a condition of receiving Part D funds, a Part D Sponsor must agree to comply with the applicable requirements and standards and the terms and conditions of payment governing the Part D program.  *See* 42 U.S.C. § 1395w-112.  In particular, the Sponsor must agree to provide CMS with the information it requires to administer the program, 42 C.F.R. § 423.322(a), to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse, 42 C.F.R. § 423.505(h)(1), and, to require that the pharmacies in their networks agree: to perform services in a manner that is consistent with and complies with the Part D Sponsors' contractual obligations; to comply with all applicable federal laws, regulations, and CMS instructions; and, to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse.  42 C.F.R. § 423.505(i)(4)(iii)–(iv).

70.    To submit claims for drugs dispensed to Medicare enrollees under Medicare Part D, a pharmacy must individually contract with a Part D Sponsor that provides Part D benefits, or an intermediary organization (collectively referred to as the "Part D sponsor" herein).  A pharmacy that enters one of these contracts is known as a "network pharmacy."  *See* 42 C.F.R. § 423.100 (defining "network pharmacy").  When entering into these contracts, Part D Sponsors negotiate the prices that network pharmacies will be paid for covered drugs dispensed to their enrollees.  *See id.* (defining "negotiated price" as the price that "[t]he Part D sponsor (or other intermediary contracting organization) and the network dispensing pharmacy or other network

dispensing provider have negotiated as the amount such network entity will receive, in total, for a particular drug").

71.     To receive payment from CMS, a Part D Sponsor must agree to give the Part D enrollees access to "negotiated prices" for covered drugs – that is, the prices that the Plan Sponsors negotiate with providing pharmacies.  42 U.S.C. § 1395w-102(a)(1) and (d)(1); *see* 42 C.F.R. § 423.100 (defining "negotiated prices").  Such negotiated prices "shall take into account negotiated price concessions, such as discounts, direct or indirect subsidies, rebates, and direct or indirect remunerations, for covered part D drugs."  42 U.S.C. § 1395w-102(d)(1)(B).

72.     Providing enrollees with access to negotiated prices reduces the United States' outlays for prescription medication.  Medicare Part D plans have annual "coverage gaps" that start once a plan has spent a certain dollar amount on prescription drug coverage for an enrollee during a year and end once the enrollee has incurred a certain dollar amount of out-of-pocket costs during the year.  If enrollees are given the benefit of the Part D Sponsors' negotiated discounts during this coverage gap rather than being charged non-discounted prices, they will be able to purchase more medication on their own while in the coverage gap, postponing the stage at which the enrollee leaves the "coverage gap" and the Medicare Part D program picks up a higher percentage of the enrollees' prescription drug expenses.

73.     When negotiating contracts with network pharmacies to provide Part D prescription drug benefits, Part D Sponsors, or the pharmacy benefit managers (PBMs) on contract with Part D Sponsors (collectively referred to herein as "Part D Sponsors"), typically require the inclusion of "Usual and Customary" ("U&C") clauses that require network pharmacies to include their U&C charge, including all available discounts, on their claim, and cap the Part D Sponsor's reimbursement at the U&C charge.

74.     According to the Pharmacy Audit Assistance Service (PAAS), when the Medicare Part D program was first launched in 2005, the majority of PBMs with Medicare Reimbursement Schedules capped reimbursement for Part D medications at the pharmacy's U&C charge.  For example, as of 2005, the following large PBMs were reimbursing no more than a pharmacy's "usual and customary charge" for generic medications:  4DPharmacy Management Systems, Argus, Cigna Health Care (for 90 day supplies of medication), Community Care Rx, Express Scripts, Health Trans, Medco Health Solutions, Inc., Navitus Health Solutions, LLC, Pharmacare, Prime Therapeutics, and RxAmerica.  *See* MEDICARE Part D (PDP(MA-PD) PROGRAMS, Assembled by PAAS National, 10/10/2005, http://c.ymcdn.com/sites/www.wsparx.org/resource/resmgr/imported/PartD_PDP_MA-PD_ PlanTable3_10-05.pdf (accessed on June 16, 2016).

75.     For example, Express Scripts, a PBM that includes Rite Aid in their network, in 2005 reimbursed pharmacies no more than their "usual and customary retail price."  Express Scripts Pharmacy Manual, 2005, at 7, available at ftp://ftp.ihs.gov/ rpms/POS/Payer Pharmacy Manuals/Express Scripts PharmacyNetworkManual.pdf (accessed June 17, 2016).   Express Scripts required network pharmacies to submit their U&C retail price, "including all discounts on applicable date of fill," *id.* at 6, and defined the term as: "The usual and customary retail price of a Covered Medication cash transaction at the Pharmacy dispensing the Covered Medication (in the quantity dispensed) on the date that it is dispensed, including any discounts or special promotions offered on such date."  *Id*. at 67.

76.     During the years since 2005, many of the large PBMs have continued to reimburse pharmacies for medication provided to Medicare Part D beneficiaries at no more than their "usual and customary charge."

77.     For example, the standard contract between the PBMs Wellpoint Pharmacy Management and Anthem Prescription Management, and participating pharmacies, which include Rite Aid, provides that, "[u]nless otherwise agreed to in writing, Claims will be paid at the lower of (i) Pharmacy's Usual and Customary Charge; (ii) the AWP discount plus the applicable Dispensing Fee; or (iii) MAC plus the applicable Dispensing Fee, minus, in all instances, any Covered Individual Co-payments and/or transmission fee(s).... In no case shall reimbursement to Pharmacy exceed Pharmacy's Usual and Customary Charge."  The contract then defines "Usual and Customary Charge" to mean: "the lowest price the Pharmacy would charge to a cash-paying customer with no insurance for an identical pharmaceutical good or service on the date and at the location that the prescription is dispensed."   WellPoint Participating Pharmacy Provider Agreement, copyright 2006, available at https://www.anthem.com/ prescription/noapplication/f1 /s0/ t0/pw_ad079969.pdf, accessed on June 15, 2016.

78.     Likewise, PharmAvail Benefit Management, a large PBM that provides benefits management services for Part D sponsors, and that contracts with network pharmacies including Rite Aid, requires network pharmacies to charge: "the lower of: (a) the amount applicable to a given Plan or (b) Pharmacy's usual and customary price (*i.e.*, Pharmacy's cash price to the general public at the time of dispensing inclusive of all coupons, discounts, and other deductions)."  PharmAvail Benefit Management Participating Pharmacy Agreement, available at https://www.pharmavail.com/#Provider (accessed on or about April 19, 2016).

79.     As another example, the standard Part D contract of PBM Plus, Inc., a large PBM that provides benefits management services for Part D sponsors, and that contracts with network pharmacies including Rite Aid, provides reimbursement for generic drugs at "the lower of the

Maximum Allowable Cost ("MAC"), as defined herein, AWP less 25% (AWP – 25%) of the dispensed medication plus a dispensing fee of $1.75, or the pharmacy's then current U&C retail charge."   PBM Plus, Inc. Provider Pharmacy Pharmaceutical Care Network Agreement, available at https://www.pbmplus.com/docs/Pharmacy%20Network%20Agreement.pdf (accessed on June 9, 2016).  The PBM Plus contract requires a network pharmacy to agree to submit its then current Usual and Customary charge via PBM PLUS' on line system with each request for payment."  *Id.*  The contract defines the Usual and Customary Charge as "[t]he price Pharmacy would have charged an Enrollee (net of any applicable discount, including, but not limited to senior citizen discounts, frequent shopper discounts, non-insurance discounts, or any other special discount offered to attract customers) on the date the service was provided for a retail prescription IF the Enrollee were a cash customer."  *Id.*

80.     Network pharmacies that submit claims to Part D Plan Sponsors must certify to the accuracy, completeness, and truthfulness of that data and acknowledge that they will be used to seek federal funds.  42 C.F.R. § 423.505(k).

81.     Network pharmacies must use the NCPCD claim format to submit their charges to Part D Sponsors and the PBMs on contract with these sponsors.  *See* 42 U.S.C. § 1320d-4(b) (mandating compliance with transaction standards set by HHS); 45 C.F.R. § 162.1102(a)-(c) (adopting the NCPDP standard as the standard for retail pharmacy electronic drug claims).

82.     Federal law prohibits entities from "submitt[ing] or caus[ing] to be submitted bills or requests for payment" under the Medicare program for items or services "furnished substantially in excess of such . . . entity's usual charges . . . for such items or services."  42 U.S.C. § 1320a-7(b)(6).  Entities that do so may be excluded from the federal healthcare programs. *Id.*

83.     Moreover, any "health care practitioner and any other person (including a hospital or other health care facility, organization, or agency)" that provides health care services for which payment may be made "in whole or in part" under the Medicare Act is required to "assure . . . that services or items ordered or provided" will be provided "economically."  42 U.S.C. § 1320c-5(a)(1).

## TRICARE USUAL AND CUSTOMARY REQUIREMENT

84.     TRICARE is the healthcare program managed by the Department of Defense for active duty and retired service members and their eligible beneficiaries.  *See* 10 U.S.C. § 1071 et seq.  TRICARE benefits include prescription drug coverage.  Since 2004, Express Scripts has been the TRICARE PBM for retail pharmacy services.

85.     The 2005 Express Scripts Pharmacy Network Manual provided that claims must be submitted in the NCPDP format, and "[a]ll claims submitted must include the Pharmacy's Usual and Customary retail price, including all discounts on applicable date of fill."

86.     The 2005 Manual defined "Usual and Customary Retail Price (U&C)" as:

> The usual and customary retail price of a Covered Medication in a cash transaction at the Pharmacy dispensing the Covered Medication (in the quantity dispensed) on the date that it is dispensed, **including any discounts or special promotions offered on such date.**

(emphasis added).

87.     The 2005 Manual provided that claims will be reimbursed based on the *lowest* of: (i) AWP less the contracted discount baseline price (as calculated by First DataBank) less the contracted discount for the specific network; (ii) MAC or submitted cost plus the contracted dispensing fee for that network; or (iii) U&C.

88.     The 2015 Express Scripts Network Provider Manual defined "Usual and Customary Retail Price" as:

To the extent not defined in the Provider Agreement, Usual and Customary Retail Price means the usual and customary retail price of a Covered Medication in a cash transaction at the Pharmacy dispensing the Covered Medication (in the quantity dispensed) on the date that it is dispensed, **inclusive of "loss leaders", frequent shopper or special customer discounts or programs, competitor's matched price or any and all other discounts, special promotions, and programs causing a reduction in the price offered to that Member and offered by the Network Provider (or any of its Pharmacies) on such date. Additionally, the Usual and Customary Retail Price must include any applicable discounts offered to attract customers including Members.**

(emphasis added).

89. The 2015 Manual provided that claims will be reimbursed using the following methodology:

    a)     For **Single-Source Brand Drugs**, PBM will pay the lesser of:

         i.     AWP ingredient cost minus contracted brand discount plus contracted brand dispensing fee for the applicable network; OR

         ii.     Network Provider submitted brand ingredient cost plus contracted brand dispensing fee; OR

         iii.     Usual and Customary Retail Price; OR

         iv.     If applicable, specific Sponsor reimbursement; OR

         v.     State Fee Schedule (e.g., Workers' Compensation)

    b)     For **Generic Drugs** or **Multi-Source Brand Drugs**, PBM will pay the lesser of:

         i.     AWP Generic Drugs or Multi-Source Brand Drugs ingredient cost minus contracted Generic Drug discount plus contracted Generic Drug dispensing fee for the applicable network; OR

         ii.     MAC discount plus contracted Generic Drug dispensing fee for applicable network; OR

   iii. Network Provider-submitted ingredient cost plus contracted Generic Drug dispensing fee for applicable network; OR

   iv. Usual and Customary Retail Price; OR

   v. If applicable, special Sponsor reimbursement logic; OR

   vi. State Fee Schedule (e.g., Workers' Compensation)

90. In addition, the 2015 government TRICARE Reimbursement Manual 6010.61-M (Apr. 1, 2015) provided: "The TRICARE allowable cost will be the lesser of the usual and customary price or the Maximum Allowable Cost (MAC) or TPharm contractor's contracted rate for ingredient cost."

## THE FRAUDULENT SCHEME

91. In or about September 2007, Defendant Rite Aid launched its Rx Savings Program, offering significantly reduced prices for 500 different generic medications. Rite Aid offered this program to all customers without charging an enrollment fee. Rite Aid imposes no limitation whatsoever on who may enroll in the program, or the requisite terms and conditions of purchase, with one exception: the reduced prices are not available for prescriptions funded in whole or in part by publicly funded health care programs such as Medicare Part D, Medicaid, and TRICARE. To receive the special discounts, all customers have to do is establish that their prescriptions are not paid for by a government health care program and enroll in the Rx Savings Program.

92. Exhibit A is Rite Aid's 2011 brochure setting forth the generic medications included in Rite Aid's Rx Savings Program. As stated in the brochure, in all states but Connecticut, customers enrolled in the Rx Savings Program pay only $8.99 for a 30-day supply of over 500 generic medications, and only $15.99 for a 90-day supply of over 500 generic

medications.   In addition, Rite Aid offers Rx Savings Program members heavily discounted prices for oral contraceptives, diabetes test strips, flu shots and Zolpidem Tartrate (the sleeping medication Ambiem).   In Connecticut, customers enrolled in the Rx Savings Program pay only $10.99 for a 30-day supply of over 500 generic medications.   *See* Exhibit A.   The Rx Savings Program brochures expressly state that participation in the program is "free" but not available for "[p]rescriptions paid for in whole or in part by publicly funded health care programs."

93.     Relator has been informed by a former Rite Aid pharmacist that between 90 and 95 percent of Rite Aid's non-insured pharmacy customers at his pharmacy enroll in the Rx Savings Program.

94.     The Rite Aid Rx Savings Program is not per se an illegal program, even with its exclusion of prescriptions paid for by public health programs.   If Rite Aid excluded Medicare Part D, TRICARE, and Medicaid beneficiaries from enrolling in the program and then charged those beneficiaries prices that were equal to or lower than the Rx Savings prices for the same medications, the Rx Savings Program would not lead to violations of the usual and customary charge rules.   For example, some states ask pharmacies to take into account their lowest prices to third-party payers, such as employer group health plans, when computing their "usual and customary price" for a medication.   If Rite Aid consistently computed its "usual and customary price" to Medicaid in those states based on its agreements with third-party insurers (such as employer group health plans) that provided for prices even lower than the Rite Aid Rx Savings Program prices, the Rite Aid Rx Savings Program would not lead to violations of the usual and customary charge rules.   Or, if Rite Aid performed a state and Part D Sponsor-specific computation of its "usual and customary charge," taking into account the unique definition of "usual and customary charge" in each state and in each Plan Sponsor's provider agreement, and

then consistently billed each entity in compliance with its respective rule, the Rx Savings Program would not lead to illegal behavior.  However, Rite Aid does not do so.  In many instances, Rite Aid charges Medicare Part D, TRICARE, and Medicaid beneficiaries amounts that do not take into account either the lower Rx Savings Program prices or any lower prices that Rite Aid makes available to other payers, such as third-party insurance companies.  Rite Aid's prices to the Medicare Part D program, Medicaid, and TRICARE for many of the medications covered by the Rx Savings Programs significantly exceed Rx Savings Program prices.

95.     In 2011, Relator's friend and former classmate (referred to herein by the pseudonym "John Doe"), who worked for Rite Aid in New York as a technician, pharmacist intern and pharmacist between 2002 and 2010, provided Relator with information about the Rx Savings Program.  Throughout his tenure as a Rite Aid pharmacist, John Doe processed prescriptions using Rite Aid's dispensing and billing software program, a program that automatically assigns prices upon the pharmacist entering the customer's payer information into the program.  Through his direct experience billing customers and third-party payers, including Medicaid and Medicare Part D, for prescription drugs, John Doe learned that the software program will only generate the "Rx Savings price" for a customer if the pharmacy has enrolled a customer in the program, assigned the customer an enrollment number and then entered that number, along with other information about the customer, into the computer program that handles dispensing and billing.  John Doe was instructed by the pharmacy's management that pharmacists were not permitted to enroll Medicaid and Medicare beneficiaries in the Rx Savings Program.  While employed at Rite Aid, John Doe further learned that Rite Aid's dispensing and billing software, when run by Rite Aid pharmacy staff processing a prescription drug claim, charged government health programs, including Medicare Part D and Medicaid, a price that Rite

Aid represented was its "U&C" but that did not include the discounts offered to cash-paying customers through the Rx Savings Program.

96.     Rite Aid's pharmacists and pharmacy technicians are responsible for billing any liable third-party payers such as Medicaid and Medicare Part D whenever they dispense prescription medication.  When processing a customer request for a prescription fill, the pharmacist or pharmacy technician enters information about the prescription, such as the customer name, prescriber name, medication, dosing instructions, and quantity, into Rite Aid's dispensing and billing software.  The software then produces a billing page that displays the customer's insurance coverage, if any.  The pharmacist or pharmacist technician can generate a bill to insurance by clicking on the name of an insurer with which the customer has coverage, such as a Medicare Part D or Medicaid plan.  As soon as the pharmacist or pharmacist technician clicks on the insurer name, the software transmits the claim in real time to the payer with both information input by the pharmacy staff at the register and the charges generated by the software. The claim does not go through any intermediary Rite Aid office—like a corporate billing department.  The pharmacist or pharmacy technician can view both the amount Rite Aid billed the payer along with the amount of the co-pay to be charged to the customer on a screen titled "Details."  The amount Rite Aid billed the payer is represented on the "Details" screen next to the words "cash price," which is a term Rite Aid and other pharmacies use interchangeably with "U&C" to designate the price that pharmacies are obligated to use when billing government payers.  This price represents what Rite Aid has just billed the payer.  Within seconds, the payer electronically notifies the pharmacist or technician whether the plan will cover the prescription.

97.     While employed at Rite Aid, John Doe discovered, through his experience as a pharmacist, that Rite Aid consistently charged government health programs higher amounts for

the generic medications on the Rx Savings Program list than the amounts Rite Aid charged its cash-paying customers for the same medications.  John Doe suspected this initially through conversations with Medicare Part D customers complaining about what they were being charged while in the "donut hole" of coverage, i.e., the time period in which Medicare Part D provides limited or no coverage until the beneficiary has reached a threshold level of medication spending called "catastrophic spending."  Several of John Doe's Medicare customers became upset and informed him that not only were they not being permitted to join the Rx Savings Program, they were regularly being charged amounts that very significantly exceeded the Rx Savings Program prices.  John Doe knew that pharmacies were required by law to charge Medicare Part D beneficiaries their U&C charges regardless of whether the customer was in the donut hole or the Plan Sponsor was bearing most of the cost.  Accordingly, the fact that Part D beneficiaries were being overcharged while in the donut hole alerted John Doe to the fact that Rite Aid likely was charging government health plans amounts that exceeded the Rx Savings Program price.

98.    By reviewing the "Details" screen after he had charged medications on the Rx Savings Program list to a Medicare Part D or Medicaid plan, John Doe confirmed his initial suspicions that Rite Aid was charging Medicare Part D sponsors and Medicaid plans amounts that exceeded the Rx Savings Price.  Thus, John Doe saw on the "Details" screen that the charge to these government payers exceeded the heavily discounted prices that Rite Aid charged cash-paying customers enrolled in the Rx Savings Program.

99.    To obtain specific examples of these false claims after he had stopped working at Rite Aid, John Doe checked with a Rite Aid customer he knew was a Medicaid beneficiary (referred to herein as "Customer A.B.") about the prices on the Rite Aid receipts pertaining to this customer's prior purchases of generic medications available under the Rx Savings Program.

Because he had worked as a Rite Aid pharmacist, and routinely printed out, reviewed and handed receipts to customers, John Doe knew that at Rite Aid, when Rite Aid has charged part or all of a drug purchase to insurance, the customer's receipt shows: i) an amount labeled on the receipt as the co-pay amount which reflects the amount for which the customer is responsible; and, ii) an amount labeled on the receipt as the "U&C" amount that shows what Rite Aid *actually* has charged to the insurance company. In addition, in such circumstances, he knew that the Rite Aid receipt always identifies the insurance plan that has been charged the amount identified as the "U&C." He also had learned that the "U&C" amount that appeared on the customer's receipt was the same amount that appeared on the "Details" screen for the transaction next to the words "cash price." In reviewing the receipts of this particular Medicaid-insured customer, John Doe saw that the receipts stated that Rite Aid had charged New York Medicaid a purported "U&C" that significantly exceeded the amounts charged to Rx Savings Program members for the same drug.

100.    Rite Aid's corporate headquarters implemented this scheme at all of its stores in all states in which it does business by programming its billing and dispensing software— software that ran at each and every one of its pharmacy computers in each of its stores when pharmacy staff processed and billed a prescription—to generate a false, inflated U&C charge for the medications on Rite Aid's Rx Savings Program list, and to send this charge electronically to government payers.

101.    As a result of the operation of Rite Aid's dispensing and billing software, on January 21, 2010, the Rite Aid pharmacy at 32-14 31st Street in Astoria, NY, charged New York's Medicaid program $58.99 for 30 tablets of Zolpidem Tartrate 5 mg. (Ambien) dispensed to Customer A.B. The $58.99 charge appeared on this customer's Rite Aid receipt as the "U&C"

charge, which John Doe knew from his work experience was the amount that Rite Aid had charged to Medicaid. The receipt also listed a "co-pay" amount for which the customer had been personally responsible. The Rx number for the customer was XXXXX (actual number redacted). This claim was a false claim. New York's Medicaid program required pharmacies to charge Medicaid their "usual and customary charge to the general public." At that time, Rite Aid was charging Rx Savings Program members just $19.99 for 30 tablets of Zolpidem Tartrate 5 mg. Rite Aid should have charged New York Medicaid the same discounted price.

102.    As a result of the operation of Rite Aid's dispensing and billing software, on December 14, 2010, the Rite Aid pharmacy at 32-14 31st Street in Astoria, NY, charged New York's Medicaid program $49.99 for 30 tablets of Fomotidine 40 mg. dispensed to Customer A.B. The $49.99 charge appeared on this customer's Rite Aid receipt as the "U&C" charge, which John Doe knew from his work experience was the amount that Rite Aid had charged to Medicaid. The receipt also listed a "co-pay" amount for which the customer had been personally responsible. The Rx number for the customer was YYYYY (actual number redacted). This claim was a false claim. New York's Medicaid program required pharmacies to charge Medicaid their "usual and customary charge to the general public." At that time, Rite Aid was charging Rx Savings Program members just $8.99 for 30 tablets of Fomotidine 40 mg. Rite Aid should have charged New York Medicaid the same discounted price.

103.    John Doe's understanding is that Rite Aid's policy with regard to excluding Medicaid and Medicare beneficiaries from the Rx Savings Program is uniform across the country. In light of the fact that Rite Aid's dispensing and billing software program comes from corporate headquarters and is utilized by individual pharmacies without the pharmacies' adjusting Medicaid or Medicare Part D prices to take into account the Rx Savings Program price,

John Doe inferred that Rite Aid's practice in New York of excluding the Rx Savings Program price from its computation of the "usual and customary charge" for Medicaid and Medicare Part D likely was typical of Rite Aid's billing practice across the country.

104. To corroborate his friend's understanding of Rite Aid's billing practices, Relator has obtained particularized information concerning more than two hundred additional false claims to government health plans generated by multiple Rite Aid pharmacies in 17 different states between the years 2008 and 2016. Allegations regarding these sample false claims are set forth in Paragraphs 128-149.

105. Prior to obtaining information concerning these additional false claims, Relator contacted a Rite Aid drugstore in eight of the plaintiff states besides New York and inquired as to their prices to Medicaid beneficiaries for a sample of the largest sales volume drugs of the 500 generic medications included in the Rx Savings Program. He selected these eight plaintiff states for investigation because: i) Rite Aid sells a significant volume of prescription medication in each of the states; ii) each of the states has a particularly strong U&C rule that expressly requires pharmacies to offer Medicaid the same price offered through generally available savings or discount programs; and iii) each of the states has enacted qui tam provisions permitting private plaintiffs to sue in the name of the state for the knowing submission of false claims under state-financed programs.

106. Choosing two frequently prescribed generic medications with an Rx Savings Program price of $8.99 for a 30-day supply (or $10.99 for a 30-day supply in Connecticut)—Ranitidine 300 mg. capsules, a gastrointestinal medication, and Fluoxetine 40 mg. capsules, an antidepressant—Relator asked each pharmacy for its Medicaid price for a 30-day supply of the drug (with the exception of one pharmacy, in which he did not ask about Fluoxetine because its

use would have been contraindicated in combination with other drugs about which he was inquiring).  In every single instance, Relator learned that the Rite Aid pharmacy was charging Medicaid significantly higher prices for the generic medications than the prices made available to their Rx Savings Program members.

107.    In addition, Relator selected 17 other medications with an Rx Savings Program price of $8.99 for a 30-day supply (or $10.99 for a 30-day supply in Connecticut), and he asked each pharmacy about its Medicaid pricing for a 30-day supply of two of those 17 drugs.  These 17 medications were:  Spironolactone 100 mg. tablets, a diuretic; Ciclopirox 0.77% cream and suspension solution, anti-fungal agents; Paroxetine 30 mg. tablets, an antidepressant; Amox Tr-clav 400-57 chewable tablets, an antibiotic; Betamethasone  DP AUG 0.05% cream and Bethamethasone DP 0.05% ointment, anti-inflammatory corticosteroids; Buspirone 30 mg. tablets, an anti-anxiety drug; Clomiphene Citrate 50 mg. tablets, a fertility drug; Ciprofloxacin 0.3% Opthalmic solution, an antibiotic; Clotrimazole-betameth cream, an antifungal agent; Econazole nitrate 1% cream, an anti-fungal agent; Lidocain/Prilocain Cream 2.5%, a topical pain medication; Lovastatin 40 mg. tablets, an anti-cholesterol drug; and Mometasone 0.1% cream, an anti-inflammatory corticosteroid.  In every single instance, Relator learned that the Rite Aid pharmacy was charging Medicaid significantly higher prices for the generic medications than the prices made available to their Rx Savings Program members.

108.    The results of Relator's pricing inquiries are set forth below in Paragraphs 109-127.

109.    During the week of April 18, 2011, Rite Aid pharmacies charged the following amounts for 30 Ranitidine capsules with a dosage strength of 300 mg.:

**Medication:  Ranitidine 300 mg. capsules, Quantity:  30**

| Rite Aid Store | Medicaid Price | Rx Savings Price |
|---|---|---|
| 600 West 7th St.<br>Los Angeles, CA. | $47.99 | $8.99 |
| 66 Church Street<br>New Haven, CT. | $69.99 | $10.99 |
| 891 Ponce de Leon Ave., NE<br>Atlanta, GA. | $51.99 | $8.99 |
| 4612 Woodward Ave.<br>Detroit, MI. | $49.99 | $8.99 |
| 803 South Main Street<br>Salem, IN. | $69.99 | $8.99 |
| 710 E. Broadway<br>South Boston, MA. | $69.99 | $8.99 |
| 92 South Street<br>Concord, NH. | $52.99 | $8.99 |
| 711 Broad Street<br>Providence, RI. | $69.99 | $8.99 |

110.   During the week of April 18, 2011, Rite Aid pharmacies charged the following amounts for 30 Fluoxetine capsules in a dosage strength of 40 mg.:

**Medication:  Fluoxetine HCL 40 mg. capsules, Quantity:  30**

| Rite Aid Store | Medicaid Price | Rx Savings Price |
|---|---|---|
| 600 West 7th St.<br>Los Angeles, CA. | $114.99 | $8.99 |
| 891 Ponce de Leon Ave., NE<br>Atlanta, GA. | $76.99 | $8.99 |
| 4612 Woodward Ave.<br>Detroit, MI. | $88.99 | $8.99 |
| 803 South Main Street<br>Salem, IN. | $75.99 | $8.99 |

| | | |
|---|---|---|
| **710 E. Broadway**<br>**South Boston, MA.** | **$79.99** | **$8.99** |
| **92 South Street**<br>**Concord, NH.** | **$62.99** | **$8.99** |
| **711 Broad Street**<br>**Providence, RI.** | **$76.99** | **$8.99** |

111.    During the week of April 18, 2011, a Rite Aid pharmacy in Los Angeles, CA, charged the following amounts for 30 Spironolactone tablets in a dosage of 100 mg.:

**Medication:  Spironolactone 100 mg. tablet, Quantity:  30**

| Rite Aid Store | Medicaid Price | Rx Savings Price |
|---|---|---|
| **600 West 7th St.**<br>**Los Angeles, CA.** | **$59.99** | **$8.99** |

112.    During the week of April 18, 2011, a Rite Aid pharmacy in Los Angeles, CA, charged the following amounts for 30 grams of Ciclopirox 0.77% cream:

**Medication:  Ciclopirox 0.77% cream, Quantity:  30 gm**

| Rite Aid Store | Medicaid Price | Rx Savings Price |
|---|---|---|
| **600 West 7th St.**<br>**Los Angeles, CA.** | **$54.99** | **$8.99** |

113.    During the week of April 18, 2011, a Rite Aid pharmacy in New Haven, CT, charged the following amounts for 30 Paroxetine HCL tablets with a dosage strength of 30 mg.:

**Medication:  Paroxetine HCL 30 mg. tablets, Quantity:  30**

| Rite Aid Store | Medicaid Price | Rx Savings Price |
|---|---|---|
| **66 Church Street**<br>**New Haven, CT.** | **$59.99** | **$10.99** |

114.    During the week of April 18, 2011, a Rite Aid pharmacy in New Haven, CT, charged the following amounts for Ciclopirox 0.77%, 30 ml. suspension:

**Medication:  Ciclopirox 0.77%, 30 ml. suspension**

| Rite Aid Store | Medicaid Price | Rx Savings Price |
|---|---|---|
| 66 Church Street New Haven, CT. | $60.99 | $10.99 |

115.    During the week of April 18, 2011, a Rite Aid pharmacy in New Haven, CT,

charged the following amounts for 20 Amox Tr-clav chewable tablets, 400-57:

**Medication:  AmoxTr-clav, chewable tablets, 400-57, Quantity:  20**

| Rite Aid Store | Medicaid Price | Rx Savings Price |
|---|---|---|
| 66 Church Street New Haven, CT. | $77.99 | $10.99 |

116.    During the week of April 18, 2011, a Rite Aid pharmacy in Atlanta, GA, charged

the following amounts for 15 grams of Betamethasone DP AUG 0.05% cream:

**Medication:  Betamethasone DP AUG 0.05% cream, Quantity:  15 gm**

| Rite Aid Store | Medicaid Price | Rx Savings Price |
|---|---|---|
| 891 Ponce de Leon Ave., NE Atlanta, GA. | $37.99 | $8.99 |

117.    During the week of April 18, 2011, a Rite Aid pharmacy in Atlanta, GA, charged

the following amounts for 30 Buspirone HCL tablets, in a dosage of 30 mg.:

**Medication:  Buspirone HCL 30 mg. tablets, Quantity:  30**

| Rite Aid Store | Medicaid Price | Rx Savings Price |
|---|---|---|
| 891 Ponce de Leon Ave., NE Atlanta, GA. | $104.99 | $8.99 |

118.    During the week of April 18, 2011, a Rite Aid pharmacy in Detroit, MI, charged

the following amounts for 45 grams of Betamethasone AUG DP 0.05% Cream:

**Medication:  Betamethasone AUG DP Cream 0.05%, Quantity:  45 grams**

| Rite Aid Store | Medicaid Price | Rx Savings Price |
| --- | --- | --- |
| **4612 Woodward Ave.**<br>**Detroit, MI.** | **$117.59** | **$8.99** |

119.    During the week of April 18, 2011, a Rite Aid pharmacy in Detroit, MI, charged

the following amounts for five Clomiphene Citrate tablets in a dosage of 50 mg.:

**Medication:  Clomiphene Citrate tablets, 50 mg., Quantity:  5**

| Rite Aid Store | Medicaid Price | Rx Savings Price |
| --- | --- | --- |
| **4612 Woodward Ave.**<br>**Detroit, MI.** | **$27.99** | **$8.99** |

120.    During the week of April 18, 2011, a Rite Aid pharmacy in Salem, IN, charged

the following amounts for five ml. of Ciprofloxacin 0.3 Opthalmic solution:

**Medication:  Ciprofloxacin 0.3 Opth Sol, Quantity:  5 ml**

| Rite Aid Store | Medicaid Price | Rx Savings Price |
| --- | --- | --- |
| **803 S. Main Street**<br>**Salem, IN.** | **$57.99** | **$8.99** |

121.    During the week of April 18, 2011, a Rite Aid pharmacy in Salem, IN, charged

the following amounts for 30 grams of Clotrimazole-betamethasone cream:

**Medication:  Clotrimazole-betamethasone cream, Quantity:  30 gm**

| Rite Aid Store | Medicaid Price | Rx Savings Price |
| --- | --- | --- |
| **803 S. Main Street**<br>**Salem, IN.** | **$59.99** | **$8.99** |

122.    During the week of April 18, 2011, a Rite Aid pharmacy in South Boston, MA,

charged the following amounts for 30 grams of Econazole nitrate 1% cream:

**Medication:  Econazole nitrate 1% cream, Quantity:  30 gm**

| Rite Aid Store | Medicaid Price | Rx Savings Price |
| --- | --- | --- |

| | | |
|---|---|---|
| **710 E. Broadway**<br>**South Boston, MA.** | **$37.99** | **$8.99** |

123.   During the week of April 18, 2011, a Rite Aid pharmacy in South Boston, MA, charged the following amounts for 30 grams of Lidocaine/Prilocain Cream 2.5%:

**Medication:  Lidocaine/Prilocain Cream 2.5%, Quantity:  30 gm**

| **Rite Aid Store** | **Medicaid Price** | **Rx Savings Price** |
|---|---|---|
| **710 E. Broadway**<br>**South Boston, MA.** | **$56.99** | **$8.99** |

124.   During the week of April 18, 2011, a Rite Aid pharmacy in Concord, NH, charged the following amounts for 30 Lovastatin tablets in a dosage of 40 mg.:

**Medication:  Lovastatin 40 mg. tablets, Quantity:  30**

| **Rite Aid Store** | **Medicaid Price** | **Rx Savings Price** |
|---|---|---|
| **92 South Street**<br>**Concord, NH.** | **$66.99** | **$8.99** |

125.   During the week of April 18, 2011, a Rite Aid pharmacy in Concord, NH, charged the following amounts for 30 grams of Mometasone Furoate 0.1% ointment:

**Medication:  Mometasone Furoate 0.1% ointment, Quantity:  30 gm**

| **Rite Aid Store** | **Medicaid Price** | **Rx Savings Price** |
|---|---|---|
| **92 South Street**<br>**Concord, NH.** | **$77.99** | **$8.99** |

126.   During the week of April 18, 2011, a Rite Aid pharmacy in Providence, RI, charged the following amounts for 30 grams of Mometasone Furoate 0.1% ointment:

**Medication:  Mometasone Furoate 0.1% Ointment, Quantity:  30 gm**

| **Rite Aid Store** | **Medicaid Price** | **Rx Savings Price** |
|---|---|---|
| **711 Broad Street**<br>**Providence, RI.** | **$72.99** | **$8.99** |

127.    During the week of April 18, 2011, a Rite Aid pharmacy in Providence, RI, charged the following amounts for 30 Spironolactone tablets in a dosage of 50 mg.:

**Medication:  Spironolactone 50 mg tablets, Quantity:  30**

| Rite Aid Store | Medicaid Price | Rx Savings Price |
|---|---|---|
| 711 Broad Street<br>Providence, RI. | $35.99 | $8.99 |

## ADDITIONAL REPRESENTATIVE FALSE CLAIMS TO GOVERNMENT HEALTH PROGRAMS

128.    The following representative false claims, as well as the additional false claims reflected in Exhibits B, C, D, and E, like the Rite Aid receipts discussed above, are records of claims actually submitted to government health programs.  The claim information comes from either Rite Aid or the government health plan and, in all instances, was voluntarily provided to Relator, sometimes by the beneficiary and sometimes by the government payer itself.

**Massachusetts Medicaid**

129.    The Massachusetts Medicaid program has required pharmacies to charge Medicaid their "usual and customary charge," defined as "the lowest price that a pharmacy charges or accepts from any payer for the same quantity of a drug on the same date of service, in Massachusetts, including but not limited to the shelf price, sale price, or advertised price of an over-the-counter drug."  *Provider Manual Series, Pharmacy Manual* (September 15, 2008), p. 4-3, available at http://www.mass.gov/eohhs/docs/masshealth/regs-provider/regs-pharmacy.pdf (accessed June 18, 2016).

130.    Submitting a false claim to a state Medicaid program is a violation of the False Claims Act.  The False Claims Act imposes liability on anyone who, *inter alia*, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or

"knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(A)-(B) (post-2009 amendments).  A "claim" means a request or demand for payment either submitted directly to the United States or to a "contractor, grantee, or other recipient" of federal money as long as the money is "to be spent or used . . . to advance a Government program or interest" and if the United States has either provided or will reimburse "any portion" of the money.  *Id.* § 3729(b)(2).  A state Medicaid program is a "contractor, grantee, or other recipient" of federal money under the False Claims Act.

131.  As part of its scheme, Rite Aid repeatedly submitted false claims to Massachusetts Medicaid seeking payment of amounts far above the Usual and Customary prices it was offering to the cash-paying public, and falsely representing that these charges were its U&C charges.  For example:

    a)    On February 3, 2010, Rite Aid Pharmacy #10213, located at 510 Wilbur Avenue, Swansea, Massachusetts 02777, filled a prescription for a 30-day supply of Lovastatin 40 mg tablets (Claim Number 251003457908, NDC 00378654091) on behalf of a customer insured by Massachusetts Medicaid.  Rite Aid submitted a claim to Massachusetts Medicaid for this prescription with a $69.99 charge to the third-party payer (Massachusetts Medicaid) and falsely represented that this charge was its U&C.  The Massachusetts Medicaid program required pharmacies to charge Medicaid their "usual and customary charge."  At that time, Rite Aid charged members of the cash-paying public just $8.99 for the same 30-day supply of Lovastatin 40 mg tablets through its Rx Savings Program.

Rite Aid should have billed Massachusetts Medicaid the same discounted price.

b)    On August 6, 2011, Rite Aid Pharmacy #10187, located at 520 Main Street, Falmouth, Massachusetts 02540, filled a prescription for a 30-day supply of Paroxetine HCL 40 mg tablets (Claim Number 251121854454, NDC 00093712198) on behalf of a customer insured by Massachusetts Medicaid.  Rite Aid submitted a claim with a $76.13 charge to the third-party payer (Massachusetts Medicaid) and falsely represented that this charge was its U&C.  The Massachusetts Medicaid program required pharmacies to charge Medicaid their "usual and customary charge."  At that time, Rite Aid charged members of the cash-paying public just $8.99 for the same 30-day supply of Paroxetine HCL 40 mg tablets through its Rx Savings Program.  Rite Aid should have billed Massachusetts Medicaid the same discounted price.

132.    Additional examples of false claims Rite Aid actually submitted to Massachusetts Medicaid are attached hereto as Exhibit B.

**New York Medicaid**

133.    The State of New York's Medicaid program has stated that it would not reimburse an amount greater than a pharmacy's "usual and customary charge to the general public." www.health.state.ny.us/health_care/medicaid/program/docs/pharmacyreimbursement.  Pharmacy providers have been instructed to enter their "usual and customary charge" in the "charge" field of the claim form used to bill Medicaid.

134.   As part of its scheme, Rite Aid repeatedly submitted false claims to New York Medicaid for prices far above the Usual and Customary prices it was offering to the cash-paying public, falsely representing that these charges were its U&C charges.  For example:

a)   On August 22, 2011, Rite Aid of New York #03363, located at 650 Castle Hill Avenue, Bronx, New York 10473, filled a prescription for a 30-day supply of Glipizide XL 10 mg tablets (Claim Number 1123400047767501, NDC 59762503301) on behalf of a customer insured by New York Medicaid.  Rite Aid submitted a claim with a $28.99 charge to the third-party payer (New York Medicaid) and falsely represented that this charge was its U&C.  The New York Medicaid program required pharmacies to charge Medicaid their "usual and customary charge to the general public."  At the time, Rite Aid charged members of the cash-paying public $8.99 for the same 30-day supply of Glipizide XL 10 mg tablets through its Rx Savings Program.  Rite Aid should have billed New York Medicaid the same discounted price.

b)   On May 18, 2012, Rite Aid of New York Inc. #00597, located at 40 Vassar Road, Poughkeepsie, New York 12603, filled a prescription for a 30-day supply of Tamoxifen 20 mg tablets (Claim Number 1213900050644101, NDC 00093078256) on behalf of a customer insured by New York Medicaid.  Rite Aid submitted a claim with a $82.99 charge to the third-party payer (New York Medicaid) and falsely represented that this charge was its U&C.  The New York Medicaid program required pharmacies to charge Medicaid their "usual and

customary charge to the general public." At the time, Rite Aid charged members of the cash-paying public $8.99 for the same 30-day supply of Tamoxifen 20 mg tablets through its Rx Savings Program. Rite Aid should have billed New York Medicaid the same discounted price.

135.    Additional examples of false claims Rite Aid actually submitted to New York are attached hereto as Exhibit C.

**Michigan Medicaid**

136.    The State of Michigan's Medicaid Program has made explicit that the "usual and customary charge" must include "advertised discounts, special promotions, or other programs to initiate reduced prices made available to the general public or a similar portion of the population." *Medicaid Provider Manual, General Information for Providers* (January 1, 2011), Section 12.2, p. 35, available at http://www.mdch.state.mis.us/dch-medicaid/manuals/Medicaid ProviderManual.pdf (accessed June 18, 2016).

137.    As part of its scheme, Rite Aid repeatedly submitted false claims to Michigan Medicaid for prices far above the Usual and Customary prices it was offering to the cash-paying public, falsely representing that these charges were its U&C charges. For example:

    a)    On February 27, 2009, Rite Aid #04236, located at 11 South 11th Street, Niles, Michigan 49120, filled a prescription for a 30-day supply of Tamoxifen 20 mg tablets (Claim Number P60905810845025000, NDC 00093078256) on behalf of a customer insured by Michigan Medicaid. Rite Aid submitted a claim with a $116.27 charge to the third-party payer (Michigan Medicaid) and falsely represented that this charge was its U&C. The Michigan Medicaid program required pharmacies to charge

Medicaid their "usual and customary charge."  At the time, Rite Aid charged members of the cash-paying public $8.99 for the same 30-day supply of Tamoxifen 20 mg tablets through its Rx Savings Program.  Rite Aid should have billed Michigan Medicaid the same discounted price.

    b)    On July 26, 2012, Rite Aid #03497, located at 15242 North Holly Road, Holly, Michigan 48442, filled a prescription for a 30-day supply of Fluoxetine HCL 40 mg capsules (Claim Number P61220810008235000, NDC 00093719856) on behalf of a customer insured by Michigan Medicaid.  Rite Aid submitted a claim with a $162.84 charge to the third-party payer (Michigan Medicaid) and falsely represented that this charge was its U&C.  The Michigan Medicaid program required pharmacies to charge Medicaid their "usual and customary charge."  At the time, Rite Aid charged members of the cash-paying public $9.99 for the same 30-day supply of Fluoxetine HCL 40 mg capsules through its Rx Savings Program.  Rite Aid should have billed Michigan Medicaid the same discounted price.

138.    Additional examples of false claims Rite Aid actually submitted to Michigan Medicaid are attached hereto as Exhibit D.

**Indiana Medicaid**

139.    Indiana's Medicaid regulations specifically limit the reimbursement to pharmacies to no more than "[t]he provider's submitted charge, representing the provider's usual and customary charge for the drug, as of the date of dispensing." 405 IAC 5-24-4(a)(3) (2016) (effective July 25, 1997).

140.    In Indiana, the state Medicaid agency has specified that a pharmacy's usual and customary charge to the general public must include "any special pricing (for example, $4 generic programs) for the covered service." *Indiana Health Coverage Programs Provider Reference Module, Pharmacy Services* (February 25, 2016), p. 12, available at http://provider.indianamedicaid.com/media/155565/pharmacy%20services.pdf (accessed June 18, 2016).

141.    As part of its scheme, Rite Aid repeatedly submitted false claims to Indiana Medicaid for prices far above the Usual and Customary prices it was offering to the cash-paying public, falsely representing that these charges were its U&C charges.  For example:

    a)    On September 20, 2013, Rite Aid #04654, located at 7505 State Route 311, Sellersburg, Indiana 47172, filled a prescription for a 30-day supply of Tamoxifen 20 mg tablets (Claim Number 132632920266003, NDC 00093078256) on behalf of a customer insured by Indiana Medicaid. Rite Aid submitted a claim with a $115.67 charge to the third-party payer (Indiana Medicaid) and falsely represented that this charge was its U&C. The Indiana Medicaid program required pharmacies to charge Medicaid their "usual and customary charge."  At the time, Rite Aid charged members of the cash-paying public $9.99 for the same 30-day supply of Tamoxifen 20 mg tablets through its Rx Savings Program.  Rite Aid should have billed Indiana Medicaid the same discounted price.

    b)    On December 31, 2013, Rite Aid #03530, located at 803 S. Main Street, Salem, Indiana 47167, filled a prescription for a 30-day supply of Pravastatin Sodium 40 mg tablets (Claim Number 133653149693002,

NDC 00093720298) on behalf of a customer insured by Indiana Medicaid.  Rite Aid submitted a claim with a $145.73 charge to the third-party payer (Indiana Medicaid) and falsely represented that this charge was its U&C.  The Indiana Medicaid program required pharmacies to charge Medicaid their "usual and customary charge."  At the time, Rite Aid charged members of the cash-paying public $9.99 for the same 30-day supply of Pravastatin Sodium 40 mg tablets through its Rx Savings Program.  Rite Aid should have billed Indiana Medicaid the same discounted price.

**Other State Medicaid False Claims**

142.    Additional examples of false claims Rite Aid actually submitted to California Medi-Cal, Colorado Medicaid, Connecticut Medicaid, Delaware Medicaid, Georgia Medicaid, Indiana Medicaid, Maryland Medicaid, Michigan Medicaid, New Jersey Medicaid, North Carolina Medicaid, Rhode Island Medicaid, Tennessee Medicaid, Vermont Medicaid, Virginia Medicaid, and Washington Medicaid, are attached hereto as Exhibit D.

**Medicare Part D False Claims**

143.    As explained above, to submit claims for drugs dispensed to Medicare enrollees under Medicare Part D, pharmacies typically contract with a Part D Sponsor.  A pharmacy that enters one of these contracts is known as a "network pharmacy."  *See* 42 C.F.R. § 423.100 (defining "network pharmacy").  When entering into these contracts, Part D Sponsors negotiate the prices that network pharmacies will be paid for covered drugs dispensed to their enrollees. *See id*. (defining "negotiated price" as the price that "[t]he Part D sponsor (or other intermediary contracting organization) and the network dispensing pharmacy or other network dispensing

provider have negotiated as the amount such network entity will receive, in total, for a particular drug"). When negotiating contracts with network pharmacies to provide Part D prescription drug benefits, Part D Sponsors, or the PBMs on contract with Part D Sponsors (collectively referred to herein as "Part D Sponsors"), typically require the inclusion of U&C clauses that:  i) require network pharmacies to charge the Part D sponsor their U&C charge, including all available discounts, and, ii) cap the payment to the pharmacies (including the co-pay borne by the beneficiary) at the U&C charge.

144.    Submitting a false claim to a Medicare Part D Sponsor is a violation of the False Claims Act.  The False Claims Act imposes liability on anyone who, *inter alia*, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(A)-(B) (post-2009 amendments).  A "claim" means a request or demand for payment either submitted directly to the United States or to a "contractor, grantee, or other recipient" of federal money as long as the money is "to be spent or used . . . to advance a Government program or interest" and if the United States has either provided or will reimburse "any portion" of the money.  *Id.* § 3729(b)(2).  A Part D Sponsor is a "contractor, grantee, or other recipient" of federal money under the False Claims Act.

145.    Through the operation of the dispensing and billing software programmed by Rite Aid's corporate headquarters, Rite Aid routinely submitted claims to Part D Sponsors falsely representing that it was billing its U&C when in fact its U&C price, as offered in its Rx Savings Program, were much lower.  For each sample claim listed below, Rite Aid was in the Part D plan's pharmacy network.  For example:

a)      On May 5, 2016, the Rite Aid (#04375) located at 23201 Marter Road, St. Clair Shore, Michigan 48080, filled a prescription for a 30-day supply for Timolol 0.5% eye drops (RX# 043752040518) on behalf of a customer insured by Medicare Part D.  The beneficiary's receipt for this transaction reflects that Rite Aid submitted a claim for $19.99 to the Catamaran Part D plan for this prescription, representing that this charge was its U&C. Catamaran defines the U&C price as the price charged by the pharmacy to the general public at the time of dispensing for the same prescription "including all applicable customer discounts, such as advertised or sale prices, special customer, senior citizen, frequent shopper, coupons or other discounts, a cash paying customer pays [the pharmacy]."  At the time, Rite Aid charged Rx Savings Program members $9.99 for the same supply.  Rite Aid should have billed Catamaran the same discounted price.

b)      On June 24, 2016, the Rite Aid (#07205) located at 7570 W. Farmington Avenue, Germantown, Tennessee 38138, filled a prescription for 90 tablets of Levothyroxine 75 mg (Rx# 072051547120) on behalf of a customer insured by Medicare Part D.  The beneficiary's receipt for this transaction reflects that Rite Aid submitted a claim for $62.99 to the Humana Part D plan for this prescription, representing that this charge was its U&C.  Humana defines the U&C price as the price a pharmacy has established for an uninsured, walk-in retail customer and expects pharmacies to submit the same U&C charge for Humana beneficiaries as

they do all other pharmacy customers.  At the time, Rite Aid charged Rx Savings Program members $15.99 for the same 90 tablets of Levothyroxine 75 mg.  Rite Aid should have billed Humana and the beneficiary the same discounted price.

146.    When Rite Aid (or any other pharmacy) submits a claim for payment to a Part D Sponsor, the amount paid by the insurance plan is relayed to the beneficiary through an Explanation of Benefits ("EOB") form—the same type of document most Americans receive from their health insurers after using their benefits.  CMS requires that the EOB include at the very least the total amount that was paid for the prescription drug, broken out by the amount the Part D Sponsor paid and the amount the beneficiary paid.

a)    On July 9, 2015, the Rite Aid (#04029) located at 3001 E. 10th Street, Jeffersonville, Indiana 47130, filled a prescription for a 30-day supply of Baclofen 10 mg (Claim number# 355903499391) on behalf of a customer insured by Medicare Part D.  As demonstrated by the beneficiary's EOB from the Humana Part D plan, Humana paid Rite Aid $17.80 for the prescription and the beneficiary paid $3.00.  Since this Humana Part D plan caps its payment at a pharmacy's U&C, this means that Rite Aid submitted a claim for at least $20.80 to Humana, the Part D Plan Sponsor, for this prescription.  At the time, Rite Aid charged Rx Savings Program members $9.99 for the same 30-day supply of Baclofen 10 mg.  Rite Aid should have billed Humana and the beneficiary the same discounted price.

b)    On August 8, 2015, the Rite Aid (#04029) located at 3001 E. 10th Street, Jeffersonville, Indiana 47130, filled a prescription for a 30-day supply of Baclofen 10 mg (Claim number# 156209174011) on behalf of a customer insured by Medicare Part D.  As demonstrated by the beneficiary's EOB from the Humana Part D plan, Humana paid Rite Aid $17.80 for the prescription and the beneficiary paid $3.00.  Since this Humana Part D plan caps its payment at a pharmacy's U&C, this means that Rite Aid submitted a claim for at least $20.80 to Humana, the Part D Plan Sponsor, for this prescription.  At the time, Rite Aid charged Rx Savings Program members $9.99 for the same 30-day supply of Baclofen 10 mg.  Rite Aid should have billed Humana and the beneficiary the same discounted price.

c)    On November 25, 2016, the Rite Aid (#07205) located at 7570 W. Farmington Avenue, Germantown, Tennessee 38138, filled a prescription for 90 tablets of Simvastatin 20 mg tablets (Rx# 000001551651) on behalf of a customer insured by Medicare Part D.  As demonstrated by the beneficiary's EOB, Blue Cross and Blue Shield of Tennessee's Part D plan paid Rite Aid $22.50 for the prescription and the beneficiary paid $7.50.  Since this Blue Cross and Blue Shield of Tennessee Part D plan, which is administered by Express Scripts, caps its payment at a pharmacy's U&C, this means that Rite Aid submitted a claim for at least $30.00 to Blue Cross and Blue Shield of Tennessee, the Part D Plan Sponsor, for this prescription.  At the time, Rite Aid charged Rx Savings

Program members $15.99 for the same 90 tablets of Simvastatin 20 mg. Rite Aid should have billed Blue Cross and Blue Shield of Tennessee the same discounted price.

147.    Additional examples of false claims Rite Aid actually submitted to Part D sponsors for covered Part D prescriptions are attached hereto as Exhibit E.

**TRICARE False Claims**

148.    The following representative false claim comes from the TRICARE PBM's records of claims actually submitted to the PBM.

149.    On August 16, 2016, the Rite Aid (#7205) located at 7570 W. Farmington Avenue, Germantown, Tennessee 38138, filled a prescription for a 30 tablets of Levothyroxine 88 mg (Rx# 000001546910) on behalf of a customer insured by TRICARE.  Rite Aid actually submitted a claim for $17.07 to Express Scripts, the TRICARE PBM.  Express Scripts required pharmacies to charge TRICARE their "usual and customary retail price," including any discounts.  At the time, Rite Aid charged Rx Savings Program members $9.99 for the same 30 tablets of Levothyroxine 88 mg.   Rite Aid should have billed Express Scripts the same discounted price.

FALSE CLAIMS

150.    Through the foregoing conduct, the Defendant knowingly has submitted claims to Medicare Part D sponsors, TRICARE, and state Medicaid programs that are materially false because they misrepresent Defendant's "usual and customary charge" to the general public.  A correct representation of a pharmacy's "usual and customary charge" on the claim form is material to the payment decisions of the federal-state Medicaid programs of the plaintiff states because these government health programs do not pay any more than this amount, as set forth in

their statutes, regulations and program instructions, and the price of a good or service goes to the heart of the bargain between the parties in any priced transaction. Likewise, a correct representation of a pharmacy's "usual and customary charge" on a claim form submitted to a Medicare Part D sponsor is material to that program's payment decisions in all instances in which the contract between the sponsor and the pharmacy sets pricing based on the pharmacy's "usual and customary charge," because the price of a good or service goes to the heart of the bargain between the parties in any priced transaction. Pursuant to the FCA, a claim to an entity such as a Part D sponsor that expends funds to further government purposes and is reimbursed for such expenditures in whole or in part with federal funds is subject to the FCA. *See* 31 U.S.C. § 3729(b)(2) (definition of "claim" subject to FCA). Moreover, CMS relies upon the Part D sponsors to negotiate competitive prices and requires the sponsor to make such prices consistently available to Medicare Part D beneficiaries. Likewise, a correct representation of a pharmacy's "usual and customary charge" on the claim form is material to the payment decisions of the TRICARE program because it is not willing to pay any more than this amount, as set forth in its program instructions, and the price of a good or service goes to the heart of the bargain between the parties in any priced transaction. These false claims have caused Medicare Part D, TRICARE, and the federal-state Medicaid program, in each state in which Rite Aid does business, as well as other federal and state programs, to pay excessive amounts for many of the generic medications listed on the Rx Savings Program brochures in Exhibit A.

### FAILURE TO REFUND OVERPAYMENTS

151. Through the foregoing conduct, the Defendant knowingly has avoided an obligation to repay funds owed the United States and the state Plaintiffs by improperly failing to disclose and return overpayments.

152.     The federal False Claims Act, as amended in June 2009, imposes liability on anyone who, *inter alia*, "knowingly and improperly avoids . . . an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). The statute defines the term "obligation" to mean "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). The false claims laws of the plaintiff states contain analogous provisions.

153.     The Social Security Act imposes an affirmative duty on health care providers who bill Medicare or Medicaid to disclose any Medicare or Medicaid overpayments they identify to the government health care program within 60 days of discovery, or, in the case of providers who submit cost reports (pharmacies to not do so), by the deadline for submission of their cost report. 42 U.S.C. § 1320a-7k(d). This statute expressly states that the duty it imposes is an obligation as that term is used in Section 3729(b)(3) of the federal False Claims Act. *Id.* (d)(3).

### DAMAGES

154.     The United States and the state Plaintiffs have been damaged by the difference between their payments to Rite Aid for the 500 generic medications that are part of the Rx Savings Program and Rite Aid's Rx Savings Program prices for the medications.

### <u>COUNT I</u>

(Federal False Claims Act, 31 U.S.C. § 3729(a))

155.     This is a civil action by Plaintiff Azam Rahimi, acting on behalf of and in the name of the United States, against the Defendant under the False Claims Act.

156.     Plaintiff realleges and incorporates by reference paragraphs 1 through 154 as though fully set forth herein.

157.   The Defendant knowingly has presented or has caused to be presented false or fraudulent claims for payment, in violation of 31 U.S.C. § 3729(a)(1)(A) (post-May 2009 amendment) and 31 U.S.C. § 3729(a)(1) (pre-May 2009 amendment).

158.   The Defendant knowingly has made or used, or caused to be made or used, false records or statements material to a false or fraudulent claim, in violation of 31 U.S.C. § 3729(a)(1)(B) (post-May 2009 amendment) and 31 U.S.C. § 3729(a)(2) (pre-May 2009 amendment).

159.   The Defendant has knowingly and improperly avoided obligations to pay or transmit money to the Government, in violation of 31 U.S.C. § 3729 (a)(1)(G) (2009).

160.   Because of the Defendant's conduct set forth in this Count, the United States has suffered actual damages in the hundreds of millions of dollars, with the exact amount to be determined at trial.

## COUNT TWO

(California False Claims Law, Cal. Gov. Code § 12650 et seq.)

161.   Plaintiff re-alleges Paragraphs 1 through 154, inclusive.

162.   Based on the foregoing allegations, the Defendant is liable under Cal. Gov. Code § 12650 et seq.

## COUNT THREE

(Colorado Medicaid False Claims Act, Col. Rev. Stat. § 25.5-4-303.5 et seq. (2010))

163.   Plaintiff re-alleges Paragraphs 1 through 154, inclusive.

164.   Based on the foregoing allegations, the Defendant is liable under Col. Rev. Stat. § 25.5-4-303.5 et seq. (2010).

## COUNT FOUR

(Connecticut Gen. Stat. § 17b-301b (2010))

165.    Plaintiff re-alleges Paragraphs 1 through 154, inclusive.

166.    Based on the foregoing allegations, the Defendant is liable under Conn. Gen. Stat. § 17b-301b (2010).

## COUNT FIVE

(Delaware False Claims and Reporting Act, 6 Del. Code § 1201 et seq.)

167.    Plaintiff re-alleges Paragraphs 1 through 154, inclusive.

168.    Based on the foregoing allegations, the Defendant is liable under 6 Del. Code § 1201 et seq.

## COUNT SIX

(District of Columbia False Claims Act, D.C. Code § 2-381.01 et seq.)

169.    Plaintiff re-alleges Paragraphs 1 through 154, inclusive.

170.    Based on the foregoing allegations, the Defendant is liable under D.C. Code § 2-381.01 et seq.

## COUNT SEVEN

(Georgia State False Medicaid Claims Act, Georgia Code, Title 49, Ch. 4, Art. 7B)

171.    Plaintiff re-alleges Paragraphs 1 through 154, inclusive.

172.    Based on the foregoing allegations, the Defendant is liable under the Georgia State False Medicaid Claims Act, Georgia Code, Title 49, Ch. 4, Art. 7B.

## COUNT EIGHT

(Indiana False Claims & Whistleblower Protection Law, Ind. Code § 5-11-5.5.-1 et seq.

(2005))

173.    Plaintiff re-alleges Paragraphs 1 through 154, inclusive.

174.    Based on the foregoing allegations, the Defendant is liable under the Indiana False Claims & Whistleblower Protection Law, Ind. Code § 5-11-5.5-1 et seq.

## COUNT NINE

(Louisiana's Medical Asst. Programs Integrity Law, La. Rev. Stat. §46:437.1 et seq.)

175.    Plaintiff re-alleges Paragraphs 1 through 154, inclusive.

176.    Based on the foregoing allegations, the Defendant is liable under La. Rev. Stat. § 46:437.1 et seq.

## COUNT TEN

(Massachusetts False Claims Law, ALM Ch. 12 § 5A-0 et seq.)

177.    Plaintiff re-alleges Paragraphs 1 through 154, inclusive.

178.    Based on the foregoing allegations, the Defendant is liable under the Massachusetts False Claims Law, ALM Ch. 12 § 5A-0 et seq.

## COUNT ELEVEN

(Michigan Medicaid False Claims Act, Mich. Code 400.601 et seq.)

179.    Plaintiff re-alleges Paragraphs 1 through 154, inclusive.

180.    Based on the foregoing allegations, the Defendant is liable under the Michigan Medicaid False Claims Act, Mich. Code 400.601 et seq.

## COUNT TWELVE

(Nevada's False Claims Act, Nev. Rev. Stat. § 357.010 et seq.)

181.  Plaintiff re-alleges Paragraphs 1 through 154, inclusive.

182.  Based on the foregoing allegations, the Defendant is liable under Nev. Rev. Stat. § 357.010 et seq.

## COUNT THIRTEEN

(New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 et seq. (2008))

183.  Plaintiff re-alleges Paragraphs 1 through 154, inclusive.

184.  Based on the foregoing allegations, the Defendant is liable under N.J. Stat. § 2A:32C-1 et seq. (2008).

## COUNT FOURTEEN

(New York False Claims Act, NY Fin. Law, Art. 13)

185.  Plaintiff re-alleges Paragraphs 1 through 154, inclusive.

186.  Based on the foregoing allegations, the Defendant is liable under the New York False Claims Act, NY Fin. Law, Art. 13.

## COUNT FIFTEEN

(North Carolina's False Claims Act, N.C. Gen. Stat. § 1-605 et seq. (2010))

187.  Plaintiff re-alleges Paragraphs 1 through 154, inclusive.

188.  Based on the foregoing allegations, the Defendant is liable under N.C. Gen. Stat. § 1-605 et seq. (2010).

## COUNT SIXTEEN

(Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 et seq. (2010))

189.  Plaintiff re-alleges Paragraphs 1 through 154, inclusive.

190.     Based on the foregoing allegations, the Defendant is liable under the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 et seq. (2010).

## COUNT SEVENTEEN

(Tennessee Medicaid False Claims Act, Tenn. Code § 71-5-181 et seq.)

191.     Plaintiff re-alleges Paragraphs 1 through 154, inclusive.

192.     Based on the foregoing allegations, the Defendant is liable under Tenn. Code § 71-5-181 et seq.

## COUNT EIGHTEEN

(Virginia Fraud Against Taxpayers Act, Va. Code § 8.01-216.1 et seq.)

193.     Plaintiff re-alleges Paragraphs 1 through 154, inclusive.

194.     Based on the foregoing allegations, the Defendant is liable under Va. Code § 8.01-216.1 et seq.

## COUNT NINETEEN

(Washington's Medicaid Fraud False Claims Act, Wash. Code §74.66.005 et seq. (2012))

195.     Plaintiff re-alleges Paragraphs 1 through 154, inclusive.

196.     Based on the foregoing allegations, the Defendant is liable under Wash. Code § 74.66.005 et seq.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Azam Rahimi prays for the following relief:

197.     On Counts One through Nineteen, judgment for the United States or the State, as applicable, against the Defendant in an amount equal to three times the damages the federal or state plaintiff government, respectively, has sustained because of the Defendant's actions, plus a civil penalty for each violation at the maximum rate specified by law;

198.    On Counts One through Nineteen, an award to the Relator of the maximum allowed under the federal or state law under which suit is brought by the Relator on behalf of the federal or state plaintiff, respectively;

199.    Against the Defendant, attorneys' fees, expenses and costs of suit; and

200.    Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands that this matter be tried before a jury.

Respectfully submitted,

*/s/  Shelley R. Slade*
Shelley R. Slade
VOGEL, SLADE & GOLDSTEIN, LLP
1300 Connecticut Ave., N.W., Suite 701
Washington, D.C. 20009
Tel.: 202-537-5903
sslade@vsg-law.com

Robert L. Vogel
VOGEL, SLADE & GOLDSTEIN, LLP
1300 Connecticut Ave., N.W., Suite 701
Washington, D.C. 20009
Tel.: 202-537-5905
rvogel@vsg-law.com

Thomas Van Dusen
Bodman PLC
201 West Big Beaver Rd, Suite 500
Troy, MI 48084
Tel.: 248-743-6076
TVanDusen@bodmanlaw.com

William Christopher Carmody
Arun Subramanian
Cory Buland

Halley W. Josephs
SUSMAN GODFREY L.L.P.
1301 Ave. of the Americas, 32nd Fl.
New York, NY 10019
Tel.: (212) 336-8330
bcarmody@susmangodfrey.com
asubramanian@susmangodfrey.com
cbuland@susmangodfrey.com
hjosephs@susmangodfrey.com

*Attorneys for Azam Rahimi*

Dated: May 11, 2018

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of May, 2018, I caused the aforesaid Relator's

Third Amended Complaint to be served by filing it in the ECF system and by mailing copies

thereof by first-class  mail, postage prepaid, addressed to Defendant Rite Aid Corporation and to

all Government counsel.

*/s/  William Christopher Carmody*
William Christopher Carmody