**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| **UNITED STATES ex rel. AZAM RAHIMI, et al.** | ) |
| | ) |
| **Plaintiffs,** | ) **CIVIL ACTION NO. :** |
| | ) **2:11-cv-11940- SJM-MAR** |
| **v.** | ) |
| | ) |
| | ) |
| **RITE AID CORPORATION,** | ) **Hon. Stephen J. Murphy III** |
| | ) |
| **Defendant.** | ) |
| | ) |

# RELATOR'S OPPOSITION TO DEFENDANT'S THIRD MOTION TO DISMISS AND FOR JUDGMENT ON THE PLEADINGS

## **TABLE OF CONTENTS**

CONCISE STATEMENT OF ISSUES PRESENTED ............................................v

CONTROLLING AND MOST APPROPRIATE AUTHORITY ...........................vi

PRELIMINARY STATEMENT ........................................................................1

FACTS AND PROCEDURAL BACKGROUND ...................................................4

ARGUMENT ...............................................................................................7

I.    Relator's Allegations Were Not Publicly Disclosed. ......................................7

   A.    Legal Standard...................................................................................7

   B.    The Documents Cited by Rite Aid Do Not Disclose Its
         Fraudulent Scheme. ..........................................................................10

         1.    Rx Savings Program Press Releases and
               Advertisements............................................................................11

         2.    Reports About *Other* Pharmacies .............................................12

         3.    HHS OIG Work Plans..................................................................14

         4.    Connecticut Subpoenas..............................................................15

II.   Relator is an Original Source........................................................................20

   A.    Pre-March 23, 2010 Claims ............................................................20

   B.    Post-March 23, 2010 Claims ..........................................................24

III.  The Court Should Retain Jurisdiction Over the State-Law Claims. ............25

CONCLUSION ...........................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allison v. City of East Lansing*,
484 F.3d 874 (6th Cir. 2007) ...........................................................22

*Antoon v. Cleveland Clinic Found.*,
788 F.3d 605, 617 (6th Cir. 2015) ................................................22, 23

*Cooper v. Blue Cross and Blue Shield of Florida, Inc.*,
19 F.3d 562 (11th Cir. 1994) ...........................................................15

*Dingle v. Bioport Corp.*,
388 F.3d 209 (6th Cir. 2004) ...........................................................10

*Friedman v. Rite Aid Corp.*,
152 F. Supp. 2d 766 (E.D. Pa. 2001) ...................................................2

*Gaylor v. Hamilton Crossing CMBS*,
582 F. App'x 576 (6th Cir. 2014) .......................................................8

*In re Natural Gas Royalties*,
562 F.3d 1032 (10th Cir. 2009) ........................................................13

*Kennard v. Comstock Res., Inc.*,
363 F.3d 1039 (10th Cir. 2004) ........................................................22

*Maxwell v. Dodd*,
662 F.3d 418 (6th Cir. 2011) ...........................................................22

*Rockwell Int'l Corp. v. U.S.*,
549 U.S. 457 (2007)......................................................................21

*U.S. ex rel. Advocates for Basic Legal Equal., Inc. v. U.S. Bank, N.A.
(ABLE)*,
816 F.3d 428 (6th Cir. 2016) .....................................................8, 9, 24

*U.S. ex rel. Baltazar v. Warden*,
635 F.3d 866 (7th Cir. 2011) ...........................................................13

6839905v1/015312

*U.S. ex rel. Davis v. District of Columbia*,
  679 F.3d 832 (D.C. Cir. 2012)................................................................21, 22

*U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P.*,
  579 F.3d 13 (1st Cir. 2009)................................................................21

*U.S. ex rel. Findley v. FPC-Boron Employees' Club*,
  105 F.3d 675 (D.C. Cir. 1997)................................................................21

*U.S. ex. rel. Garbe v. Kmart Corp.*,
  824 F.3d 632 (7th Cir. 2016) ................................................................4, 5

*U.S. ex rel. Griffith v. Conn*,
  117 F. Supp. 3d 961 (E.D. Ky. July 27, 2015) ................................................21

*U.S. ex rel. Harper v. Muskingum Watershed Conservancy District*,
  842 F.3d 430 (6th Cir. 2016) ................................................................8

*U.S. ex rel. Heath v. Wisconsin Bell, Inc.*,
  760 F.3d 688 (7th Cir. 2014) ................................................................9

*U.S. ex rel. Hixon v. Health Management Systems, Inc.*,
  613 F.3d 1186 (8th Cir. 2010) ................................................................19

*U.S. ex. rel. Ibanez v. Bristol-Myers Squibb Co.*,
  874 F.3d 905 (6th Cir. 2017) ................................................................17

*U.S. ex rel. Jones v. Horizon Health Corp.*,
  160 F.3d 326 (6th Cir. 1998) ................................................................10, 17, 19

*U.S. ex rel. Little v. Shell Exploration, Prod. Co.*,
  602 F. App'x 959 (5th Cir. 2015)................................................................17

*U.S. ex rel. McKenzie v. BellSouth Telecommunications, Inc.*,
  123 F.3d 935 (6th Cir. 1997) ................................................................21, 22

*U.S. ex rel. Morgan v. Express Scripts, Inc.*,
  No. 05-cv-1714, 2013 WL 6447846 (D.N.J. Dec. 9, 2013) ................................13

*U.S. ex rel. Poteet v. Medtronic, Inc.*,
  552 F.3d 503 (6th Cir. 2009) ................................................................8, 9, 10

6839905v1/015312

*U.S. ex rel. Robinson-Hill v. Nurses' Registry and Home Health Corp.*,
No. 08-cv-145, 2012 WL 4598699 (E.D. Ky. Oct. 2, 2012) ...............................21

*U.S. ex rel. Schutte v. Supervalu, Inc.*,
No. 11-3290, 2019 WL 3558483 (C.D. Ill. Aug. 5, 2019) ..................................4

*U.S. ex rel. Winkelman v. CVS*,
827 F.3d 201 (1st Cir. 2016)...................................................................14, 18, 19

*United States v. CSL Behring, L.L.C.*,
855 F.3d 935 (8th Cir. 2017) ...........................................................................13

*United States v. Emergency Medical Associates of Illinois*,
436 F.3d 726 (7th Cir. 2006) ............................................................................13

**Statutes**

31 U.S.C. § 3729(a)(1)(G) ...................................................................................8

31 U.S.C. § 3730(e)(4)(iii).................................................................................20

31 U.S.C. § 3730(e)(4)(A) .............................................................................9, 24

31 U.S.C. § 3730(e)(4)(B) .................................................................................20

**Rules**

Fed. R. Civ. P. 12(b)(1).......................................................................................8

Fed. R. Civ. P. 12(b)(6).......................................................................................8

**Treatises**

Black's Law Dictionary 1124 (10th ed. 2014) ......................................................24

iv

## <u>CONCISE STATEMENT OF ISSUES PRESENTED</u>

1. Whether documents that do not mention the prices Rite Aid submitted to government payers as its "usual and customary" prices nevertheless publicly disclosed Rite Aid's fraudulent submission of inflated "usual and customary" prices.

   **Relator's Answer: No.**

2. Whether Relator is an "original source" with respect to the information he provided to the government about Rite Aid's "usual and customary" pricing fraud.

   **Relator's Answer: Yes.**

## CONTROLLING AND MOST APPROPRIATE AUTHORITY

Relator relies on the judicial and statutory authorities cited in this brief, including:

- 31 U.S.C. § 3730(e)(4)

- *Antoon v. Cleveland Clinic Found.*, 788 F.3d 605, 617 (6th Cir. 2015)

- *Cooper v. Blue Cross and Blue Shield of Florida, Inc.*, 19 F.3d 562 (11th Cir. 1994)

- *Dingle v. Bioport Corp.*, 388 F.3d 209, 212 (6th Cir. 2004)

- *Friedman v. Rite Aid Corp.*, 152 F. Supp. 2d 766 (E.D. Pa. 2001)

- *U.S. ex rel. Advocates for Basic Legal Equal., Inc. v. U.S. Bank, N.A.*, 816 F.3d 428, 429 (6th Cir. 2016)

- *U.S. ex rel. Baltazar v. Warden*, 635 F.3d 866 (7th Cir. 2011)

- *U.S. ex rel. Davis v. Dist. of Columbia*, 679 F.3d 832, 857–58 (D.C. Cir. 2012)

- *U.S. ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632 (7th Cir. 2016)

- *U.S. ex rel. Heath v. Wisconsin Bell, Inc.*, 760 F.3d 688 (7th Cir. 2014)

- *U.S. ex rel. Hixon v. Health Mgmt. Sys., Inc.*, 616 F.3d 1186 (8th Cir. 2010)

- *U.S. ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 919 (6th Cir. 2017)

- *U.S. ex rel. Jones v. Horizon Health Corp.*, 160 F.3d 325, 331 (6th Cir. 1998)

- *U.S. ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 511 (6th Cir. 2009)

- *U.S. ex rel. Schutte v. Supervalu, Inc.*, No. 11-3290, 2019 WL 3558483 (C.D Ill. Aug. 5, 2019)

## PRELIMINARY STATEMENT

More than two-and-one-half years after unsealing and after two unsuccessful motions to dismiss, Rite Aid now argues that this lawsuit should be dismissed because publicly available materials from nearly a decade ago disclosed the fraud at issue in this case and thereby triggered the False Claims Act's public disclosure bar. That is flat wrong. **None** of the press clippings and advertisements Rite-Aid has scrounged up even mentions, let alone discusses, Rite-Aid's misreporting of "usual and customary" prices to government health care programs, the crux of this case.

Rite Aid itself conceded, in prior pleadings to this Court, that the very material it now claims amounted to a "public disclosure" of Rite Aid overbilling government payers had nothing to do with overbilling government payers. For example, Rite Aid **now** argues that its own advertisements disclosed the fraud by stating that customers using government benefits were "ineligible" for the Rx Savings Program. However, Rite Aid previously represented the exact opposite to this Court:

> That federal beneficiaries are not permitted to enroll in the Rx Savings club **has nothing to do with how Medicare or Medicaid is billed**. [fn.] In fact, providing valuable club benefits to federal beneficiaries could raise concerns under the Anti-Kickback Act . . . That this published carve-out was a prophylactic measure to ensure legal compliance **is a far more reasonable inference than that it was adopted to defraud the government**.[1]

---

[1] Rite Aid's March 27, 2017 Brief in Support of Motion to Dismiss, Dkt. 55, at 17 & n.1 (emphasis added).

Rite Aid's other three categories of supposed public disclosures fare no better. Category two consists of news articles and a lawsuit discussing whether the government receives the benefit of pharmacy discount programs at **different** chain pharmacies. One article observes that some members of the industry make their discount prices available to government payers, whereas others don't.[2] **None of these materials, found in Exhibits K-M of Rite Aid's motion, mentions Rite Aid, let alone alleges that Rite Aid was overbilling government payers**. Reports of fraud by other companies do not trigger the public disclosure bar. Put simply, "[p]ublic allegations of fraud on the part of specific pharmacy chains other than Rite Aid is not public disclosure of fraud at Rite Aid." *Friedman v. Rite Aid Corp.*, 152 F. Supp. 2d 766, 769–70 (E.D. Pa. 2001).

Category three is even more far-fetched. It consists of annual Work Plans of the HHS Office of the Inspector General (OIG) identifying, as an area for **future inquiry**, "the extent to which" retail pharmacy chains were charging Medicaid the correct "usual and customary charge" (U&C) when billing for the generic drugs in their special savings programs. *See* RA Mot., Dkt. 104, 18–19. Rather than revealing government knowledge of U&C billing fraud by Rite Aid or other pharmacies, these work plans disclose the polar opposite: that the federal government didn't know

---

[2] *See* Rite Aid Mot., Ableson Ex. K, Dkt. 104-12, at 2 (reporting that Wal-Mart, Target and Sam's Club correctly report their discount prices to Medicare).

whether Rite Aid and the other large pharmacy chains were charging Medicaid the correct U&C for the drugs in their special savings program.

Finally, Rite Aid invokes press coverage of a dispute between the Connecticut Attorney General's office and Rite Aid in late 2010. *See* RA Mot., Dkt. 104, 19–21, 26. But rather than disclose overbilling of government programs by Rite Aid, these articles concern Rite Aid's decision to raise prices **to cash paying customers** in what Rite Aid said was an effort to **comply** with Connecticut law. Nothing in these articles leads to an inference that Rite Aid overbilled Connecticut Medicaid or other government programs.

In sum, none of the materials identified by Rite Aid—separately or collectively—disclose the essential elements of Rite Aid's fraud: that Rite Aid's Rx Savings Prices were charged to approximately 90% of cash paying customers, and that Rite Aid nonetheless reported a significantly higher price to government payers as its purported U&C. Even if these materials did disclose the fraud alleged herein— which they did not—Relator's suit should not be barred because he satisfies the requirements of the "original source" exception to the public-disclosure bar.

Rite-Aid's motion is nothing more than a transparent last-ditch effort to avoid liability before it faces the music. Since Relator filed this case, court after court has confirmed that conduct just like Rite Aid's was improper. In 2016, the Seventh Circuit held that a scheme by Kmart pharmacy to "artificially divid[e] its customer

3

base" using a membership program just like Rite Aid's—and then bill government payers more than its membership program prices—resulted in violations of the federal and state false claims laws. *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 645 (7th Cir. 2016). Just last month, a federal court granted partial summary judgment against another pharmacy chain finding that it had categorically submitted false claims when it failed to consider cheaper prices it offered cash customers when billing government health programs. *See United States ex rel. Schutte v. SuperValu, Inc.*, No. 11-3290, 2019 WL 3558483 (C.D. Ill. Aug. 5, 2019).

Discovery is already uncovering internal documents showing that Rite Aid committed its fraudulent scheming knowingly and that the prices it submitted to the government as its usual and customary charges have been more than **one billion dollars** higher than its Rx Savings Prices. Relator's complaint, corroborated by Rite Aid's hidden documents (not the ancient press clippings that Rite Aid now identifies), are what demonstrates the essential elements of Rite-Aid's fraud. The Court should not give Rite-Aid a "get out of jail free" card for its fraud based on its meritless public disclosure argument, and Rite Aid's now-third Rule 12 motion should be denied.

## FACTS AND PROCEDURAL BACKGROUND

Relator Azam Rahimi alleges that Rite Aid falsely billed publicly funded health programs more than Rite Aid's "usual and customary charge to the general

public" ("U&C") for hundreds of prescription drugs. Specifically, while Rite Aid offered heavily discounted prices on prescription drugs to cash paying customers through its Rx Savings Program, Rite Aid failed to consider those prices when it reported the "usual and customary charge" for its prescription drugs to government sponsored healthcare programs and billed significantly higher prices than permitted.

When a pharmacy submits a claim for payment to a government health program (or even a private insurer), it is generally reimbursed pursuant to a formula that pays it the "lesser of" several possible prices. In the case of Medicaid, for example, rules and regulations usually provide that the state program will reimburse a pharmacy the "lesser of" some type of measure of the drug cost, a limit fixed by the federal government, **or the pharmacy's U&C**. The U&C provisions are intended to further the stated Medicaid goal of achieving cost-effective care by ensuring governments pay no more than the pharmacy's competitive prices for the same drugs. *See Garbe*, 824 F.3d at 644. Medicare Part D and private insurance contracts contain similar provisions. For this reason, pharmacies are required to submit their U&C price when making any claim for reimbursement so that the payer can determine whether the pharmacy's U&C is the lowest price and, if so, reimburse the pharmacy at that price.

Beginning in 2010, Rahimi, who is a pharmacist, questioned whether Rite Aid was considering its Rx Savings Prices when reporting its usual and customary charge

to government healthcare programs.[3] He could not know whether this was the case, however, because from publicly available information alone he could not determine: (i) how frequently Rite Aid was charging its Rx Savings prices to cash customers, or (ii) what prices Rite Aid was reporting to government payers as its usual and customary charges.[4]

Rahimi contacted a pharmacy school classmate who had worked at Rite Aid and was familiar with its billing practices. Rahimi learned that (a) the vast majority of cash transactions at Rite Aid stores were paid at the Rx Savings prices and that (b) Rite Aid was billing government payers, including Medicare and Medicaid, far more than the Rx Savings prices. Relator then contacted many Rite Aid pharmacies around the country, collecting data from Rite Aid pharmacists about the inflated amounts that Rite Aid was billing government payers. On May 2, 2011, Relator submitted this information to the Government. On May 3, 2011, Relator filed this case under seal pursuant to the state and federal false claims acts. On January 19, 2017, this Court unsealed the case. *See* Dkt. Nos. 46, 47, 48.

On March 27, 2017, Rite Aid first moved to dismiss. Rite Aid argued that there was a "paucity of information" to provide notice of whether Rite Aid had failed to take "into account its Rx Savings club prices in its charges to Medicare Part D or

---

[3] *See* RA Mot., Ex. Z, Dkt. 104-27, April 27, 2011 Rahimi Disclosure Statement, at 4 ¶ 3.
[4] *Id.*

Medicaid," and that absent that information, the action could not proceed. Dkt. No.

55, at 16. Rite Aid stated that one issue was that Relator's reference to the

"membership exclusion [for government payers] in the Rx Savings club brochure

. . . says nothing about **how federal programs are billed**." *Id.* at 28 (emphasis

added). The Court agreed more information was required that "particular false

claims were actually submitted," denying the motion, and granting leave to amend.

Dkt. No. 70, at 13, 15-16. Relator amended his complaint in May 2018, Dkt. 71, and

the Court denied Rite Aid's second motion to dismiss. In neither of those motions

did Rite Aid ever raise a public disclosure challenge or suggest that its fraud was

previously "disclosed."

On July 31, 2019, Rite Aid filed its third Rule 12 motion. Now, Rite Aid

argues that "news stories . . . Rite Aid[] press releases, advertisements, and website

disclosures were more than sufficient" to provide notice "of the 'likelihood' that Rite

Aid was not submitting its reduced Rx Savings Program prices to Medicaid and the

other publicly funded health care programs at issue." RA Mot., Dkt. 104, at 25.

## ARGUMENT

### I.    Relator's Allegations Were Not Publicly Disclosed.

#### A.    Legal Standard

Before the March 23, 2010 amendments to the FCA, the public disclosure bar

was jurisdictional—now it is merely an affirmative defense to be raised by the

7

defendant. *See United States ex rel. Advocates for Basic Legal Equal.*, *Inc. v. U.S. Bank, N.A. (ABLE)*, 816 F.3d 428, 433 (6th Cir. 2016). For claims prior to March 23, 2010, for which the public-disclosure bar is jurisdictional, "the relator bears the burden of establishing a court's subject matter jurisdiction over her FCA claim." *United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 511 (6th Cir. 2009). For post-2010 claims, "the standard applicable to Rule 12(b)(6) motions governs," and with regard to the public-disclosure bar, the plaintiff must merely "allege facts that 'state a claim to relief that is plausible on its face' and that, if accepted as true, are sufficient to 'raise a right to relief above the speculative level.'" *United States ex rel. Harper v. Muskingum Watershed Conservancy District*, 842 F.3d 430, 435 (6th Cir. 2016); *see id.* at 435 (public disclosure bar "no longer jurisdictional" and simply treated as an "affirmative defense" for pleading-standard purposes). Importantly, all of Rite Aid's alleged overbilling prior to the March 23, 2010 amendment **also** led to FCA violations after the date of the amendment. This is because Relator has alleged that Rite Aid has violated the FCA on a continuing basis by failing to disclose and refund to government payers the overpayments it previously has received. *See* Third Amended Complaint, Dkt. 71, ¶¶ 151–53; 31 U.S.C. § 3729(a)(1)(G).

Regardless of whether the defendant's motion is under "12(b)(1)" or "Rule 12(b)(6)," however, the Court must "accept the allegations set forth in the complaint as true, drawing all inferences in favor of the plaintiff." *Gaylor v. Hamilton Crossing*

*CMBS*, 582 F. App'x 576, 578–79 (6th Cir. 2014); *see also* Court's March 30, 2019 Order, Dkt. No. 92, at 8 ("As in any other context, the Court construes the *qui tam* complaint in the light most favorable to the plaintiff, [and] accepts all factual allegations as true . . . .").

An action is to be dismissed based on the "public disclosure" bar only when "substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" in certain qualifying forums. 31 U.S.C. § 3730(e)(4)(A). The bar applies only when "the factual basis of the claim" was publicly disclosed before the relator filed suit. *ABLE*, 816 F.3d at 429. Mere "rumors of reported fraud" are insufficient to warrant dismissal, *Poteet*, 552 F.3d at 513 n.6, and courts have "cautioned against the use of the public disclosure bar at a 'high level of generality,'" *United States ex rel. Heath v. Wisconsin Bell, Inc.*, 760 F.3d 688, 691 (7th Cir. 2014). "To determine whether" the public-disclosure bar applies, "a court must consider first whether there has been any public disclosure of [the] fraud, and second whether the allegations in the instant case are 'based upon' the previously disclosed fraud." *Poteet*, 552 F.3d at 511 (internal quotation marks omitted). "If the answer is 'no' to either of these questions, the inquiry ends, and the *qui tam* action may proceed . . . ." *Id*.

In the Sixth Circuit, "[t]wo types of disclosures [have been found] sufficient to put the government on notice of fraud." *Poteet*, 552 F.3d at 512. The first type of

9

public disclosure that may put the government on notice of fraud is a "direct allegation" of fraud. *Id.* at 513. The second type of public disclosure is an "implied" disclosure of fraud, which arises **only** when there is a publicly disclosed "transaction that includes **both** the state of the facts as they are plus the misrepresented state of facts," *id.* at 512 (citing *Dingle v. Bioport Corp.*, 388 F.3d 209, 212 (6th Cir. 2004)). *Id.* (emphasis added). In other words:

> [I]f X + Y = Z, Z represents the *allegation* of fraud and X and Y represent its essential elements. In order to disclose the fraudulent *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer **Z, *i.e.*, the conclusion that fraud has been committed**.
>
> *[Q]ui tam* actions are barred only when enough information exists in the public domain to expose the fraudulent transaction (the combination of X and Y), or the allegation of fraud (Z).

*U.S. ex rel. Jones v. Horizon Health Corp.*, 160 F.3d 326, 331 (6th Cir. 1998) (bold emphasis added).

### B.    The Documents Cited by Rite Aid Do Not Disclose Its Fraudulent Scheme.

Rite Aid cannot show public disclosure of its U&C fraud because the sources Rite Aid cites neither allege it engaged in a fraudulent scheme nor disclose the essential elements of that scheme. The misrepresented state of facts is that Rite Aid was complying with its obligation to report accurate U&C prices. The true state of facts is that Rite Aid's **true** U&C prices were, in fact, much lower—when properly accounting for Rite Aid's large number of Rx Savings scripts—but were not

10

accurately reported to government payers. Below, Relator addresses each set of materials Rite Aid relies upon.

### 1. Rx Savings Program Press Releases and Advertisements

Rite Aid first argues that statements in its press releases and advertisements regarding the Rx Savings Program—which excluded beneficiaries of government healthcare programs from **participating directly** in the Rx Savings Program—bar this suit. *See* RA Mot. Dkt. 104, 14-16, 24, Exs. D-G, J. As Rite Aid conceded in an earlier round of briefing, however, that argument "mix[es] apples and oranges" because such documents discuss only who can **sign up** to be a member of the Rx Savings Program, not how Rite Aid **determines the U&C charge** it reports to government healthcare plans. *Id.* at 17. The difference between the concepts is so stark that Rite Aid previously emphasized to this Court that very point about its "ineligibility" disclaimers:

> That federal beneficiaries are not permitted to enroll in the Rx Savings club has **nothing to do with how Medicare or Medicaid is billed**. [fn.] In fact, providing valuable club benefits to federal beneficiaries could raise concerns under the Anti-Kickback Act . . . That this published carve-out was a prophylactic measure to ensure legal compliance is **a far more reasonable inference than that it was adopted to defraud the government**.[5]

---

[5] March 27, 2017 Rite Aid Brief in Support of Motion to Dismiss, Dkt. 55, at 17 & n.1 (emphasis added).

As Rite Aid acknowledged, there are indeed legitimate reasons why a law-abiding pharmacy wouldn't permit those using government health insurance to join a special savings program with fixed prices.

### 2.    Reports About *Other* Pharmacies

Next, Rite Aid urges dismissal based upon press reports about **other** pharmacies that were charging the government more than their discount program prices. Rite Aid points to "news media report[s] that certain large chain pharmacies were not providing Medicare Part D, Medicaid, and other publicly funded health care programs with the reduced generic drug prices offered through their membership programs." Rite Aid Mot., Dkt. 104, at 17; *see id.* at 25. But not one of those articles even **mentions** Rite Aid. *See id.* at 17, Exs. K, L. Instead, the articles point away from Rite Aid, suggesting that pharmacies **other than Rite Aid**—Walgreens, CVS, and KMart—were not charging the government the prices in their discount programs.

Rite Aid suggests that allegations of fraud by one or two players in an industry is enough to preclude false claims cases against anyone else in the industry perpetrating a similar scheme. Rite Aid Mot., Dkt. 104, at 27-28. This simply is not the law. "[I]n order to bar claims against a particular defendant, the public disclosures relating to the fraud must either **explicitly identify that** defendant as a participant in the alleged scheme," or "*provide enough information about the*

participants in the scheme such that the **defendant is identifiable**." *United States v.
CSL Behring, L.L.C.*, 855 F.3d 935, 944 (8th Cir. 2017) (bold emphasis added); *see
also United States ex rel. Baltazar v. Warden*, 635 F.3d 866, 868 (7th Cir. 2011)
("As far as we can tell, no court of appeals supports the view that a report
documenting widespread false claims, but not attributing them to anyone in
particular, blocks *qui tam* litigation against every member of the entire industry.").
And to the extent Rite Aid is relying on cases regarding allegations of "industry
wide" or rampant fraud,[6] those are inapposite here, because Rite Aid does not, and
cannot point to pre-filing allegations by the government, the media or anyone as to
"industry-wide" violations of the U&C rules. Nothing in Rite Aid's cited sources
suggests any reason that fraud committed by one chain pharmacy implicated fraud

---

[6] For example, in *CSL Behring*, the relator alleged a pharmaceutical manufacturer
and pharmacies reported inflated average wholesale prices (AWP)—a measure
relied upon by government payers to fix payment rates—to publications relied upon
by those government payers. 855 F.3d at 938–39. Dismissing the case, the Eighth
Circuit observed that "the public disclosures alleged industry-wide fraud through the
use of AWPs." *Id.* at 946; *accord U.S. ex rel. Morgan v. Express Scripts, Inc.*, No.
05-cv-1714, 2013 WL 6447846, at *12, *15 (D.N.J. Dec. 9, 2013) (dismissed for
same reason). Similarly, in *In re Natural Gas Royalties*, 562 F.3d 1032 (10th Cir.
2009), a Senate Report had already found "large scale" fraud in an entire industry of
the type alleged in the complaint. *Id.* at 1039. And *United States v. Emergency
Medical Associates of Illinois*, which affirmed dismissal where the federal
government had already instituted a specific nationwide audit investigating medical
schools including the defendant for the precise fraudulent billing practice at issue,
was implicitly overruled by the reasoning of Judge Easterbrook in *Baltazar*, *supra*.
436 F.3d 726, 728 (7th Cir. 2006).

by every chain pharmacy in the industry. In fact, the opposite was true: the very sources Rite Aid relies upon affirmatively indicate that other large chain pharmacy programs were **complying with their obligations** to consider discount-pricing when submitting U&C prices to government payers.[7]

### 3.    HHS OIG Work Plans

Rite Aid claims two OIG Work Plans, and a press release concerning the first work plan, publicly disclosed an "industrywide [U&C] fraud" sufficient to provide "notice of [Rite Aid's] potential involvement." RA Mot., Dkt. 104, at 18, 27, Exs. O-Q. Rite Aid again overstates the facts. The OIG Work Plans did disclose that OIG was **planning** to check, in fiscal year 2010 and subsequent years, "the extent to which" large chain pharmacies were reporting correct U&C prices for the generic drugs in their generic discount savings programs. *See* Dkt. 104, Ex. O, at 66; Ex. P, at 79. But the government's plans to check pharmacies' compliance with U&C-

---

[7] *See U.S. ex rel. Winkelman*, 827 F.3d 201, 205 (1st Cir. 2016) ("[I]n a press release, issued in June of 2010, the Attorney General vouchsafed that: CVS Caremark's actions are at odds with other pharmacies that have extended their discount program drug pricing to the state Medicaid program . . . .); Dkt. 104, Ableson Decl. Ex. K. ("Wal-Mart, Target and Sam's Club pharmacies also sell many generics at $4 a month or less, and the same prices apply to Medical Assistance, Medicare and private prescription coverage.").

reporting obligations do not disclose an allegation that Rite Aid (or any pharmacy) violated U&C billing rules, let alone engaged in fraud by doing so knowingly.

Courts have recognized that—far from indicating a public disclosure—information indicating that the government is generally aware of the potential for non-compliance, but does not know where it is occurring, underscores the critical importance of relators in bringing to light the specific misconduct of specific companies. *See, e.g.*, *Cooper v. Blue Cross and Blue Shield of Florida, Inc.*, 19 F.3d 562, 566 (11th Cir. 1994) ("The government often knows on a general level that fraud is taking place and that it, and the taxpayers, are losing money. But it has difficulty identifying all of the individual actors engaged in the fraudulent activity. . . . This . . . is precisely where the government needs the help of its 'private attorneys general.'"). Notably, subsequent HHS-OIG Work Plans right through 2013, long after Mr. Rahimi filed his complaint, noted that the government **still had not gotten around to launching any such inquiry into this area**.[8]

### 4.   Connecticut Subpoenas

Rite Aid also suggests that its fraud was publicly disclosed by reports of a joint investigation by the Connecticut Attorney General and the Connecticut

---

[8] *See* Ex. A, 2012 OIG Work Plan, at III-3 ("Medicaid Claims for Drugs Purchased Under Retail Discount Generic Programs"); Ex. B, 2013 OIG Work Plan, at 52 ("Drug Pricing—Drugs Purchased Under Retail Discount Generic Programs").

Department of Consumer Protection[9] into whether Rite Aid misled the public when it asserted that its recent **price hikes** for **cash paying customers** were necessitated by a change in Connecticut law. The fact that the Attorney General coordinated his investigation with the state Department of Consumer Protection says it all: the focus of Connecticut's inquiry was Rite Aid's interactions **with consumers**, not with Medicaid (or any other government health program). *See, e.g.*, RA Mot., Dkt. 104, Ex. S ("The drug store chain posted signs that falsely blamed the higher prices and program changes on the new [Connecticut] law."); Ex. T ("[The AG's office] issued a subpoena for more information about the [Rx Savings Program] changes and said the [Connecticut] law doesn't require Rite Aid to change its savings program."); Ex. U ("Nothing in the act prohibits Rite Aid from continuing to offer the same drug discount benefits to Connecticut residents through its Rx Savings program that it offers to the residents of other states."); Ex. V ("Rite Aid . . . is unfairly blaming the increases on a new state law.").

Rite Aid seems to be hanging its hat on the fact that the Attorney General's press release referenced Connecticut's amended Medicaid statute in the context of discussing Rite Aid's purported reason for increasing its prices to cash paying

---

[9] *See, e.g.,* Dkt. 104, Ex. S ("Attorney General Richard Blumenthal, in cooperation with the Department of Consumer Protection (DCP), today issued a subpoena to Rite Aid demanding information about significant changes and price increases to a discount drug program that the company falsely blamed on a new state law.")

customers. Rite Aid's hopes are misplaced. First of all, to the extent that the press release and follow-on articles reference Medicaid, they imply that Rite Aid increased its cash pay prices to ensure **compliance** with—not violation of—Connecticut's new Medicaid law. It goes without saying that publicity concerning a defendant's efforts to comply with the law does not disclose that the defendant broke the law. *See U.S. ex. rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 919 (6th Cir. 2017) (rejecting defendant's argument that a prior commitment in a public document **to comply with** the regulations at issue triggered public disclosure bar); *see also U.S. ex rel. Little v. Shell Exploration, Prod. Co.*, 602 F. App'x 959, 971–74 (5th Cir. 2015) (defendant's earlier complaints about legal requirements at issue in relator's complaint are not public disclosure of defendant's non-compliance.).

Second, the Attorney General's press release and the related articles (like every other source Rite Aid cites) contain no allegation whatsoever that Rite Aid was overcharging Connecticut Medicaid (the "Z" of the fraud) or submitting a purported U&C to Connecticut Medicaid that was different from its true U&C (the "X +Y" of the fraud). *See Jones*, 160 F.3d at 331. In fact, far from disclosing U&C fraud, the press release and the articles don't mention "usual and customary," "U&C" or overbilling of Medicaid at all when discussing Rite Aid.

Rite Aid no doubt cites the articles from Connecticut in hopes of piggy backing off of a distinct set of public disclosures by the Connecticut Attorney

General about the pharmacy chain **CVS**, which were the subject of the First Circuit's public disclosure decision in *U.S. ex rel. Winkelman v. CVS*, 827 F.3d 201 (1st Cir. 2016). But the public reports and statements were very different in that case. The public disclosures about CVS uniformly and squarely alleged that CVS was overbilling government programs. The disclosures began with a report submitted to Congress disclosing that CVS was overcharging the Federal Employees Health Benefits Program (FEHBP) by not taking into account its Health Savings Plan discount prices when setting its charges to FEHBP. *Id.* at 204.[10] That report was followed by news articles reporting on the public battle between CVS and Connecticut over CVS's steadfast and illegal refusal to include its discounted Health Saving Plan prices when calculating its U&C prices to Connecticut. *Id.* at 204–05. The Attorney General of Connecticut even publicly proclaimed that CVS disagreed that state law required it to pass its Health Savings Pass discount on to Connecticut

---

[10] Rite Aid has included an article about the report, although not the report itself, as Exhibit L to the Ableson Decl., Dkt. 104-13. The First Circuit explained that its public disclosure finding relied, in part, on the following:

> In February of 2010, a coalition of labor unions under the banner "Change to Win" issued a report comparing the HSP drug prices charged by CVS with prices charged by CVS for the same drugs to federal employees enrolled in the Federal Employee Health Benefits Program (FEHBP). The report concluded that in its role as the FEHBP's pharmacy benefits manager, **CVS overcharged by "hundreds of millions of dollars."**

*Id.* at 204 (emphasis added).

18

Medicaid and noted that "CVS Caremark's actions are at odds with other pharmacies that have extended their discount program drug pricing to the state Medicaid program." RA Mot., Dkt. 104, Ex. Y, at 2. As the First Circuit observed,

> The [Connecticut] Attorney General's press release, parroted in the subsequent news articles, made manifest the state's belief that its then-existing regulations mandated that CVS provide Medicaid with "the lowest drug price" that CVS was offering to consumers, which the state contended was the HSP price. This cutting of corners, the Attorney General contended, meant that taxpayers missed out on savings potentially amounting to "millions of dollars." Nor was CVS's stubborn refusal to treat HSP prices as U&C prices in doubt.

> The [Conn. AG's] press release and resulting media coverage dwelt, with conspicuous clarity, upon CVS's persistent practice of not giving Medicaid the HSP price.

*Winkelman*, 827 F.3d at 209 (1st Cir. 2016).

In contrast, the articles about Rite Aid said **nothing** about **billing** government programs, let alone **overcharging** them by failing to pass on the Rx Savings prices as Rite Aid's U&C. The absence of this critical element in the news articles about Rite Aid—that Rite Aid's billed U&C prices exceeded its true U&C prices—is fatal to Rite Aid's public disclosure argument. *See, e.g.*, *Jones v. Horizon Health Corp.*, 160 F.3d at 331 ("*[Q]ui tam* actions are barred **only when** enough information exists in the public domain the expose the fraudulent transaction . . . ."); *U.S. ex rel. Hixon v. Health Management Systems, Inc.*, 613 F.3d 1186, 1188 (8th Cir. 2010) (no public disclosure where it was relator's information, not public disclosures, that established the "essential element—the false claim itself"). The same is true here. Absent

19

allegations that Rite Aid charged Medicaid higher U&Cs than it was permitted, the critical elements of Rite Aid's fraud were not disclosed.

## II.    Relator is an Original Source

Even if the U&C fraud against Rite Aid had been publicly disclosed, the information that Relator provided to the state and federal government would qualify him as an "original source" and therefore exempt from the public disclosure bar. *See* 31 U.S.C. § 3730(e)(4)(iii). Because Relator asserts claims both prior to and after the March 2010 amendment of the False Claims Act (and parallel amendments to the state false claims acts), Rahimi's qualification for the original source exception should be analyzed under each.

### A.    Pre-March 23, 2010 Claims

Prior to March 23, 2010, the federal FCA defined an "original source" as one with "direct and independent knowledge" of the information underlying his allegations, who had disclosed his information to the Government prior to filing suit. 31 U.S.C. § 3730(e)(4)(B) (2010).

As a threshold issue, Rite Aid argues that Relator cannot be an original source for the pre-2010 claims because the proffered public disclosures occurred before Relator provided his "direct and independent" information to the government. Rite Aid is correct that the Sixth Circuit once embraced this rule—relying on a statutory construction from the D.C. Circuit that has since been **rejected by the Supreme**

Court. *See U.S. ex rel. McKenzie v. BellSouth Telecommunications, Inc.*, 123 F.3d 935, 942 (6th Cir. 1997) (relying on *United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675 (D.C. Cir. 1997), *overruling recognized by U.S. ex rel. Davis v. District of Columbia*, 679 F.3d 832, 834, 838 (D.C. Cir. 2012)).

*Findley* and *McKenzie*'s holdings were premised on interpreting the statutory original source provision to require the relator to be the "original source" of the "information" **from the public disclosure,** not the "information" **alleged in the relator's complaint**. *Findley*, 105 F.3d at 691. The Supreme Court expressly rejected that logic in *Rockwell Int'l Corp. v. U.S.*, 549 U.S. 457, 470–74 (2007). The D.C. Circuit later explained at length why *Rockwell* had overruled its holding in *Findley*, concluding that "*Findley*'s requirement no longer has any textual basis, and the policy judgment upon which it relied contradicts *Rockwell*'s rationale." *Davis*, 679 F.3d at 838. After *Rockwell*, the original source exception "only requires that a relator provide his or her information prior to the filing of the *qui tam suit*," not before the alleged "public disclosure." *United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 579 F.3d 13, 28 (1st Cir. 2009).[11] The Court is not bound by

---

[11] Although not required to reach the issue, district courts in this Circuit have likewise recognized that *McKenzie* has likely been overruled. *See United States ex rel. Griffith v. Conn*, 117 F. Supp. 3d 961, 971 (E.D. Ky. July 27, 2015) ("*McKenzie* . . . may be in conflict with . . . *Rockwell* . . . ."); *United States ex rel. Robinson-Hill v. Nurses' Registry and Home Health Corp.*, No. 08-cv-145, 2012 WL 4598699, at *11 (E.D. Ky. Oct. 2, 2012) (noting that *McKenzie* potentially "overrule[d]" by the

Sixth Circuit decisions that have been so clearly undermined by a subsequent Supreme Court decision. *See, e.g.*, *Maxwell v. Dodd*, 662 F.3d 418, 421 (6th Cir. 2011) ("To the extent earlier decisions failed to account for this distinction, *see, e.g.*, *Allison v. City of East Lansing*, 484 F.3d 874, 876-77 (6th Cir. 2007), they are no longer good law on the point in view of recent Supreme Court authority. Today's approach is consistent with the approach of other circuits addressing the question.").

On the merits, under the pre-2010 version of the FCA, the requirement of "[d]irect knowledge" does not mean "first-hand knowledge"—it simply means that the relator has "knowledge gained by the relator's own efforts" and not solely "from the labor of other people." *Antoon v. Cleveland Clinic Found.*, 788 F.3d 605, 617, 619 (6th Cir. 2015). A relator can show "direct" knowledge even if some of the information provided to the government has been acquired from others—there is "no requirement that a relator be a corporate insider." *Id.* (quoting *Kennard v. Comstock Res., Inc.*, 363 F.3d 1039, 1044-45 (10th Cir. 2004)). As for "independent" knowledge—that simply requires that the relator's information not be "depend[e]nt on [the] public disclosure." *Id.* at 617; *see also id.* at 618 ("Some reliance on public records or information is acceptable and, indeed, it is hard to imagine that a non-

---

"Supreme Court" (citing *Davis*)). Although the Sixth Circuit, in a 2017 summary order, still relied on *McKenzie*, it did not address the question of its overruling.

insider could ever obtain original source status without at least some consultation of publicly available information.").

The information Relator obtained (and provided to the Government) was "direct" and "independent" of public information. As explained above, no information in the public domain provided any indication of the core allegation in this case—that the U&Cs Rite Aid reported to government payers were false because Rite Aid's true U&Cs were the lower discounted prices Rite Aid offered to the public through the Rx Savings Program. Relator's knowledge that Rite Aid was not doing so was gained "by the relator's own efforts," *Antoon*, 788 F.3d at 619—he "placed telephone calls," to Rite-Aid pharmacies in multiple states, "inquired as to the prices that pharmacy charged customers insured by Medicaid and Medicare Part D," and "compared [that] price to the Rx Savings Program price for the same drug, in the same quantity." Dkt. 104, Ex. Z, at 7–8 ¶ 13. Most of Relator's disclosure statement pertains to this specific issue—documenting specific examples of false U&Cs Rite Aid provided to the government, which Relator gained through his own efforts.

Finally, and contrary to Rite Aid's argument, there is no requirement that a relator "be a corporate insider," *Antoon*, 788 F.3d at 619—and the fact that some of Relator's information came from communications with a Rite Aid insider does not alter this conclusion. Moreover, much of Relator's information came from his own personal knowledge and legwork.

### B.      Post-March 23, 2010 Claims

Relator's original-source status for post-2010 claims is straightforward. After

that date, the FCA and its state equivalents require only that Relator have knowledge

that is "independent of and materially adds to the publicly disclosed allegations or

transactions, and who has voluntarily provided the information to the Government

before filing [the case]." 31 U.S.C. § 3730(e)(4)(A). "Materiality . . . requires the

claimant to show it had information 'of such a nature that knowledge of the item

would affect a person's decision-making,' is 'significant,' or is 'essential.'" *ABLE*,

816 F.3d at 431 (quoting Black's Law Dictionary 1124 (10th ed. 2014)).

For the reasons discussed *supra*, the information Relator provided to the

government before filing this suit—including that Rite Aid was not accounting for

discounted-prescription prices when reporting "usual and customary prices" to

government payers—is a crux of the fraud alleged in this case, and could not have

been ascertained by reference to public sources alone. Additionally, Relator's

disclosure provided material, new information obtained through his communications

with a Rite-Aid insider. Such information included that Rite Aid's dispensing and

billing software, corporate-wide, applied a pre-set U&C when billing government

payers that was not adjusted to take into account discounts given to cash paying

customers at the pharmacy, and, sample receipts for medications indicating that Rite

Aid was reporting as its U&C in transactions with New York Medicaid a price much higher than the Rx Savings price. *See* Dkt. 104, Ex. Z, 6–7 ¶¶ 10–12; 18–19.

## III. The Court Should Retain Jurisdiction Over the State-Law Claims.

Rite Aid advances no independent argument for dismissal of the "claims [asserted] under analogous state false claims statutes." Dkt. 104, at 34 & n.8 (citing Dkt. 71, ¶¶ 161–96). Accordingly, this Court should reject Rite Aid's motion on those claims for the same reasons.

## CONCLUSION

For the foregoing reasons, the Court should deny Rite Aid's third Rule 12 motion as it did the first two.

Respectfully submitted,

Dated:  September 11, 2019

/s/ Shelley R. Slade
Shelley R. Slade
VOGEL, SLADE & GOLDSTEIN, LLP
1300 Connecticut Ave., N.W., Suite 701
Washington, D.C. 20009
Tel.: 202-537-5903
sslade@vsg-law.com

Thomas Van Dusen
Bodman PLC
201 West Big Beaver Rd, Suite 500
Troy, MI 48084
Tel.: 248-743-6076
TVanDusen@bodmanlaw.com

William Christopher Carmody
Arun Subramanian

Cory Buland
Halley W. Josephs
William D. O'Connell
SUSMAN GODFREY L.L.P.
1301 Ave. of the Americas, 32nd Fl.
New York, New York 10019
Tel.: (212) 336-8330
bcarmody@susmangodfrey.com
asubramanian@susmangodfrey.com
cbuland@susmangodfrey.com
hjosephs@susmangodfrey.com
boconnell@susmangodfrey.com
*Attorneys for Relator Azam Rahimi*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 11th day of September, 2019, I caused the aforesaid Relator's Opposition to Defendant's Third Motion to Dismiss and for Judgment on the Pleadings to be served by filing it in the ECF system and by mailing copies thereof by first-class mail, postage prepaid, addressed to Defendant Rite Aid Corporation and to all Government counsel.

/s/  William D. O'Connell
William D. O'Connell