UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF
AMERICA, et al.,

        Plaintiffs,

*ex rel.* AZAM RAHIMI,

        Plaintiff/Relator,

v.

RITE AID CORPORATION,

        Defendant.
        _____/

Case No. 2:11-cv-11940

HONORABLE STEPHEN J. MURPHY, III

**ORDER GRANTING RELATOR'S
MOTION FOR LEAVE TO FILE SUR-REPLY [111],
GRANTING DEFENDANT'S MOTION TO DISMISS FOR LACK
OF SUBJECT MATTER JURISDICTION AND FOR JUDGMENT ON
THE PLEADINGS [104], AND FINDING MOOT RELATOR'S MOTION
TO AUTHORIZE SEALING OF RELATOR'S MOTION TO COMPEL [113]**

On May 3, 2011, Relator Azam Rahimi filed his qui tam complaint. ECF 1. The Court set a deadline for Government intervention and ordered the case to be unsealed on January 20, 2017. ECF 45, PgID 495 (under seal). After multiple amendments, Relator filed his third, and most recent, amended complaint ("TAC"). ECF 71. After filing an answer, Defendant moved to dismiss some of Relator's claims for lack of subject-matter jurisdiction and for judgment on the pleadings as to Relator's remaining claims. ECF 104. After Relator responded to the motion and Defendant filed its reply, Relator moved for leave to file a sur-reply. ECF 111. During the pendency of the motions, Relator also filed a motion to file under seal a motion to

1

compel. ECF 113 (under seal). The Court reviewed all the briefs and finds that a hearing is unnecessary. *See* E.D. Mich. LR 7.1(f). For the reasons below, the Court will grant Relator's motion to file a sur-reply, will consider Relator's sur-reply, and will grant Defendant's motion to dismiss and for judgment on the pleadings. Because the order will terminate the case, the Court will also find moot Relator's motion to file under seal the motion to compel.

## BACKGROUND

The Court thoroughly recounted the factual background of the case in its March 30, 2019, opinion and order denying Defendant's first motion to dismiss the TAC. *See* ECF 92, PgID 2072–77. The Court will adopt the background portion of that prior order here.

## LEGAL STANDARD

"When subject matter jurisdiction is challenged under [Federal Rule of Civil Procedure] 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Madison-Hughes v. Shalala*, 80 F.3d 1121, 1130 (6th Cir. 1996) (citations omitted). "Rule 12(b)(1) motions to dismiss for lack of subject-matter jurisdiction generally come in two varieties: a facial attack or a factual attack." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007) (citation omitted). For a factual attack, as here, "no presumptive truthfulness applies to the allegations" and "[i]n its review, the district court has wide discretion to allow affidavits, documents, and even a limited evidentiary hearing to resolve jurisdictional facts." *Id.* (citation omitted).

"The standard of review for a judgment on the pleadings is the same as that for a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." *E.E.O.C. v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001) (citations omitted). When analyzing a motion to dismiss under Civil Rule 12(b)(6), the Court must view the complaint in the light most favorable to the plaintiff, presume the truth of all well-pleaded factual assertions, and draw every reasonable inference in favor of the non-moving party. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). To survive a motion to dismiss, "the complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 468 (6th Cir. 2005) (citation omitted). It must allege facts "sufficient 'to raise a right to relief above the speculative level,' and to 'state a claim to relief that is plausible on its face.'" *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)) (internal citation omitted).

## DISCUSSION

I.  Relator's Motion for Leave to File a Sur-Reply

As an initial matter, the Court must address Relator's motion for leave to file a sur-reply in opposition to Defendant's motion to dismiss the TAC. ECF 111. Relator seeks leave to respond to what he characterizes as a new argument that Defendant raised for the first time in its reply brief. The Court is not convinced that Defendant included a new argument in its reply brief so much as an elaboration of an argument

3

it raised in its initial motion. *Compare* ECF 104, PgID 2245–46 *with* ECF 109, PgID 3107–09. But Defendant did include new attachments in its reply brief, so the Court will grant Relator's motion for leave and will consider as filed the sur-reply he attached to his motion. *See Key v. Shelby Cty.*, 551 F. App'x 262, 265 (6th Cir. 2014) (quoting *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 481 (6th Cir. 2003)).

II.  Defendant's Motion to Dismiss and for Judgment on the Pleadings

   A.  *Public Disclosure Bar*

Defendant argues that Relator is foreclosed from bringing his False Claims Act ("FCA") claims in the TAC because the claims are barred by the FCA's public disclosure bar. *See* ECF 104, PgID 2231. The section of the FCA containing the public disclosure bar was amended on March 23, 2010. *See United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 918 (6th Cir. 2017). The pre-amendment bar was jurisdictional and could therefore form the basis of a Civil Rule 12(b)(1) motion to dismiss, whereas the post-amendment bar is not jurisdictional and can therefore form the basis of a Civil Rule 12(b)(6) motion to dismiss. *United States v. Garman*, 719 F. App'x 459, 465 n.3 (6th Cir. 2017) (citations omitted). Regardless of the vehicle, however, Relator's pre-amendment and post-amendment claims are all barred by the FCA's public disclosure bar.

Qui tam actions are barred by the public disclosure bar if there was a prior disclosure that was both (1) public, and (2) "revealed the same kind of fraudulent activity against the government as alleged by the relator." *United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 511 (6th Cir. 2009) (citations omitted). A disclosure

4

"is public if it appears 'in the news media' or is made 'in a criminal, civil, or administrative hearing, [or] in a congressional, administrative, or Government Accounting Office report, audit, or investigation.'" *Id.* at 512 (quoting 31 U.S.C. § 3730(e)(4)(A)).[1] To determine whether the public disclosure bar applies here, the Court will take judicial notice of the government documents and news articles attached to Defendant's motion to dismiss and for judgment on the pleadings and attached to Defendant's reply brief. *See United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, No. 5:13-cv-2145, 2015 WL 7575937, at *4 (N.D. Ohio Nov. 25, 2015) (on a Rule 12(b)(6) motion, "the Court may consider documents that are referred to in the pleadings and are integral to the claims without converting the motion to one for summary judgment" and the Court may "take judicial notice of certain public records," specifically those "whose existence or contents prove facts whose accuracy cannot reasonably be questioned.") (citations omitted).[2]

The disclosure "reveals fraud if 'the information is sufficient to put the government on notice of the likelihood of related fraudulent activity.'" *Poteet*, 552 F.3d

---

[1] *Poteet* was decided before the above-mentioned amendments to the FCA. The current relevant language of 31 U.S.C. § 3730(e)(4)(A) lists the qualifying vehicles of public dissemination as "a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party," "a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation," and "the news media." Pertinent here, "news media" is an enumerated source in both versions of the statute.

[2] Again, the Court may also weigh evidence when deciding a Rule 12(b)(1) motion that constitutes a factual attack on subject-matter jurisdiction. *See Gentek Bldg. Prods., Inc.*, 491 F.3d at 330.

at 512 (citation omitted). "[T]he disclosure is not required to use the word 'fraud' or provide a specific allegation of fraud . . . 'but need merely to disclose information which creates an inference of impropriety.'" *Id.* (citations omitted). Further, "the information suggesting fraud need not even come from the same source as long as the different sources 'together provide information that leads to a conclusion of fraud.'" *Id.* at 512–13 (citations omitted). A public disclosure of fraud occurs either when there is a public disclosure that directly alleges fraud or when there is a public disclosure or disclosures that reveal both the misrepresented state of the facts and the true state of the facts. *Id.* (citations omitted).³

Here, the Connecticut Attorney General's Office issued a press release on August 25, 2010, recounted in the news media, announcing an investigation of Defendant. ECF 104-20. The press release stated that Defendant increased its Rx Savings discount program prices in Connecticut "[a]pparently in response" to a new Connecticut law "requir[ing] pharmacies to provide Medicaid and other state programs the same prescription drug discounts they offer consumers." *Id.* at 2675. The press release further stated that Defendant "posted signs that falsely blamed the higher prices and program changes on the new law" by claiming that the law required Defendant to "impose these drug price increases on Connecticut consumers." *Id.* The press release noted that "[u]nder these circumstances, [Defendant's] intention to

---

³ Although the list of what sources can qualify as public disclosures and the definition of an "original source" were altered in the 2010 amendments to the FCA, the above explanation of what information must have been publicly disclosed for a qui tam complaint to be barred applies to both the pre-amendment and post-amendment statute. *See Ibanez*, 874 F.3d at 918.

6

abruptly restrict a popular program that has assisted families in defraying costs of medications raises significant legal questions." *Id.* at 2676. The same day, Targeted News Service reprinted the press release in full, *see* ECF 104-22, and Reuters reported on it, noting the price increases in Connecticut and the signs Defendant posted blaming the new Connecticut law. *See* ECF 104-21, PgID 2678.

Notably, both the Connecticut Attorney General's press release and the Reuters article about the press release commented on the similarity between the Connecticut Attorney General's investigation into Defendant and its "recent" investigation into CVS. *See* ECF 104-20, PgID 2676; ECF 104-21, PgID 2680; ECF 104-22, PgID 2686. The referenced investigation into CVS formed the basis of a First Circuit opinion affirming the District of Massachusetts's finding that a qui tam complaint against CVS was barred by the public disclosure bar. *See United States ex rel. Winkelman v. CVS Caremark Corp.,* 827 F.3d 201, 208–11 (1st Cir. 2016). The First Circuit emphasized that "the Connecticut publicity" about CVS's response to Connecticut's above-described law was alone enough to constitute a public disclosure of CVS's alleged fraudulent billing of Medicare Part D and various state Medicaid programs. *Id.* at 209 n.5.

The Connecticut Attorney General's press release regarding CVS stated that CVS disagreed with Connecticut's belief that its preexisting laws required CVS to afford the Connecticut Medicaid program its discount program prices. ECF 109-2, PgID 3115. It also stated that after Connecticut passed its new law to explicitly codify its understanding of its preexisting laws, "CVS responded by threatening to end its

7

[discount program] in Connecticut." *Id.* And it noted that "CVS Caremark's intention to abruptly cancel a popular program that has assisted families in defraying the costs of medications is indeed alarming and raises significant legal questions." *Id.*

The First Circuit characterized the press release and coverage about the release as "dwel[ling], with conspicuous clarity, upon CVS's persistent practice of not giving Medicaid the [discount program] price. Indeed, once the Connecticut legislature amended its Medicaid statutes to mandate that CVS provide the [discount program] prices to the state's Medicaid program, CVS threatened to end the [discount program] entirely." *Winkelman*, 827 F.3d at 209 (emphasis omitted). The First Circuit concluded that "[o]n this record, it requires hardly an inferential step to connect the allegedly true and allegedly misrepresented facts. The publicly disclosed materials revealed, quite plainly, that CVS was not providing its [discount program] price as its [usual and customary] price to Connecticut's Medicaid program." *Id.*

It further concluded that the same materials also "revealed Connecticut's belief that the [discount program] prices should have been provided to the state's Medicaid program even before the statutory change." *Id.* It therefore held that "[t]he allegations and transactions that comprised the essential elements of the claimed fraud were in plain sight after these disclosures." *Id.* And the First Circuit was not persuaded by the relators' argument that the disclosures did not reveal that CVS's fraudulent scheme extended to Medicare Part D or other states' Medicaid programs. *Id.* Instead, the First Circuit found that "[w]hen it is already clear from the public disclosures that a given requirement common to multiple programs is being violated

8

and that the same potentially fraudulent arrangement operates in other states where the defendant does business," the public disclosures suffice to bar qui tam complaints alleging the fraudulent scheme as to any government program. *Id.* at 210.

The similarities between the Connecticut publicity here and the publicity in *Winkelman* are impossible to ignore. The press release about CVS announced that Connecticut was launching an investigation into CVS after CVS threatened to end its discount program in Connecticut in response to the 2010 law. *See* ECF 109-2, PgID 3115. And the press release about Defendant similarly announced the launch of an investigation into Defendant after it raised its discount program prices in Connecticut in response to the same law. ECF 104-20, PgID 2675. The press releases used almost identical language to explain that the companies' "abrupt[]" decisions regarding their discount programs in Connecticut "raise[d] significant legal questions." *Compare* ECF 104-20, PgID 2676 *with* ECF 109-2, PgID 3115.

The Court will also adopt the First Circuit's finding that "Connecticut's belief that the [discount program] prices should have been provided to the state's Medicaid program even before the statutory change" was publicly disclosed in the press release and news articles about CVS. *Winkelman*, 827 F.3d at 209. Even though Connecticut's belief about what was required before the 2010 law was not disclosed separately in the press surrounding Defendant's conduct, its disclosure in the press surrounding CVS's conduct is sufficient. *See Poteet*, 552 F.3d at 512 (information revealing different elements that collectively lead to the inference of fraud can come from different sources). Like in *Winkelman*, "[t]he allegations and transactions that

9

compromised the essential elements of the claimed fraud were in plain sight after these disclosures." *Winkelman*, 827 F.3d at 209.

Relator's argument that nothing in the articles about the Connecticut Attorney General's investigation into Defendant "leads to an inference that [Defendant] overbilled Connecticut Medicaid or other government programs," ECF 107, PgID 2758, is unconvincing in light of *Winkelman*. And Relator's attempt to distinguish the public disclosures at issue in *Winkelman* and the public disclosures about Defendant has merit but is ultimately unavailing.

Relator argues that "the lynchpin of *Winkelman* was the Court's conclusion that . . . the Connecticut Attorney General's press release . . . specifically alleged that, because CVS's [discount program] prices were the pharmacy's lowest prices, CVS" was required to charge Connecticut Medicaid the discount program prices but failed to do so. ECF 111, PgID 3144–45. Certainly, the one significant difference in the two press releases is that the press release about CVS noted that CVS publicly disagreed with Connecticut's interpretation of Connecticut law before the 2010 law was passed whereas the press release about Defendant did not note Defendant's position on what Connecticut's prior laws required. But, as explained above, both press releases emphasized that the relevant pharmacy's shift in its discount program solely in Connecticut as a response to Connecticut's 2010 law raised "significant legal questions." *Compare* ECF 104-20, PgID 2675–76 *with* ECF 109-2, PgID 3115.

The revelation that, immediately after Connecticut passed its 2010 law, Defendant raised the prices for its discount program only in Connecticut and publicly

10

blamed the 2010 law for the price increases—just as CVS threatened to terminate its discount program in response to the same law—sufficiently disclosed Defendant's alleged fraudulent scheme. Defendant's sudden price increase, like CVS's sudden threat to terminate its discount program, exposed that Defendant was not previously "providing its [discount program] price as its [usual and customary] price to Connecticut's Medicaid program." *Winkelman*, 827 F.3d at 209. Although CVS's alleged fraud was more plain on the face of the public disclosures about its 2010 conduct in Connecticut than was Defendant's alleged fraud, the Connecticut disclosures "presented enough facts to create an inference of wrongdoing" by Defendant and "put[] the government on notice of the 'possibility of fraud' surrounding the transaction." *United States ex rel. Advocates for Basic Legal Equality, Inc. v. U.S. Bank, N.A.*, 816 F.3d 428, 431 (6th Cir. 2016) (citations omitted).

Further, the First Circuit's reasoning for why the public disclosures about CVS's Connecticut fraud acted to bar claims that the same scheme extended to federal or other states' healthcare programs is equally applicable here. *See Winkelman*, 827 F.3d at 210 ("Because the complaint targets the same fraudulent conduct that was laid bare in the Connecticut disclosures, the identification of additional government programs does nothing more than add a level of detail to knowledge that was already in the public domain." And the additional level of detail is insufficient to "duck the public disclosure bar.") (internal citation omitted). The extension of Defendant's alleged fraudulent scheme to other state and federal healthcare programs was also apparent from Defendant's own advertisements for its discount program prior to the

2010 Connecticut incident (taken in conjunction with the public disclosures about the Connecticut incident). *See, e.g.*, ECF 104-5 (2008 Rite Aid press release about the discount program, noting that those "receiving benefits from publicly funded health care programs are ineligible"); 104-7 (another 2008 Rite Aid press release stating the same restriction); 104-8 (2009 Rite Aid press release stating the same restriction). Defendant's alleged fraudulent scheme was therefore publicly disclosed as to any government healthcare program (absent relevant legal differences in each state's state-law requirements) by 2010.

Finally, "[a]fter finding a public disclosure of fraud, the next step in the public disclosure analysis is to determine whether the relator's qui tam complaint is 'based upon' this disclosed fraud." *Poteet*, 552 F.3d at 513–14 (quoting 31 U.S.C. § 3730(e)(4)(A)) (emphasis and additional citation omitted). A complaint is "based upon" the public disclosures if "it is 'supported by' the previously disclosed information"—that is, if "substantial identity exists between the publicly disclosed allegations or transactions and the qui tam complaint." *Id.* at 514 (emphasis and citations omitted). An action is barred even if only part of the complaint is supported by or substantially identical to the public disclosures. *Id.* (citations omitted). Here, the TAC is "based upon" publicly disclosed information because "the primary focus of" the TAC is the same fraudulent scheme that was revealed by the disclosures. *Id.*

  B. *Original Source Exception*

Because the public disclosure bar applies, Relator's claims can survive dismissal and judgment on the pleadings only if he qualifies as an "original source."

*See Winkelman*, 827 F.3d at 211. Relator rightly notes a complication in the state of the law governing the original source exception. ECF 107, PgID 2775–76. Namely, in 2012 the D.C. Circuit overruled its case that the Sixth Circuit originally relied on for the proposition that to qualify as an original source under the pre-amendment FCA a relator had to provide his information to the Government before the date of the relevant public disclosure. *See United States ex rel. Davis v. District of Columbia*, 679 F.3d 832, 838–39 (D.C. Cir. 2012), *overruling United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675 (D.C. Cir. 1997). In 2007 the Supreme Court had found that the "information" about which a relator needed "direct and independent knowledge" to qualify as an original source under the pre-amendment FCA was the information the relator included in his complaint, not the information included in the public disclosure. *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 472 (2007). In *Davis*, the D.C. Circuit reasoned that, in light of *Rockwell*, it no longer made sense to interpret the pre-amendment FCA as requiring a relator to provide his information to the Government prior to the date of the public disclosure. *Davis*, 679 F.3d at 838. The D.C. Circuit now requires a relator to provide his information to the Government only before he files a qui tam complaint. *Id.* at 838–39.

The Sixth Circuit, however, has not followed the D.C. Circuit's post-*Rockwell* analysis. In 2015, the Sixth Circuit approvingly cited to its definition of an original source as a relator who "informs the government of the allegations of fraud before those allegations are disclosed to the public." *United States ex rel. Antoon v. Cleveland Clinic Found.*, 788 F.3d 605, 617 (6th Cir. 2015) (citing *United States ex rel. McKenzie*

13

*v. BellSouth Telecomm., Inc.*, 123 F.3d 935, 942 (6th Cir. 1997)). And the Sixth Circuit did not call its pre-disclosure requirement into question in *Antoon* even though it explicitly noted that *Davis* overruled *Findley*. *Id*. Further, in 2017, the Sixth Circuit relied on its pre-disclosure requirement when the requirement proved dispositive in the case. *Garman*, 719 F. App'x at 464 ("[E]ven if [Relator] had direct and independent knowledge of the . . . fraud, he was not an original source under the pre-amendment public-disclosure bar because his disclosure of that knowledge to the government did not occur before the [relevant] public disclosure.").

The Court is bound by the law of the Sixth Circuit. And the Sixth Circuit has continued to apply the pre-disclosure requirement after *Rockwell* and even after the D.C. Circuit discarded the requirement. Unless and until the Sixth Circuit changes course and adopts the reasoning in *Davis*, the pre-disclosure requirement remains. And here, the requirement precludes Relator from qualifying as an original source under the pre-amendment FCA or the first prong of the post-amendment FCA (which explicitly requires a relator to provide the information "prior to public disclosure," *see* 31 U.S.C. § 3730(e)(4)(B)) because he did not provide information to the Government until 2011—after the Connecticut publicity. *See* ECF 71, PgID 1362–63 (noting that Relator's source did not even provide information to Relator until 2011).

Accordingly, the Court must consider whether Relator qualifies as an original source under the second prong of the post-amendment FCA definition of "original source": one "who has knowledge that is independent of and materially adds to the publicly disclosed allegations and transactions, and who has voluntarily provided the

14

information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B). The TAC fails to meet the materiality requirement. Relator argues that the general fraudulent scheme—that Defendant was not considering its discount program prices when calculating the amount it charged government healthcare programs—"could not have been ascertained by reference to public sources alone." ECF 107, PgID 2779. But, as discussed above, the fraudulent scheme was easily inferred from the Connecticut publicity. And Relator's specific examples of Defendant's implementation of the scheme, *see* ECF 107, PgID 2779–80, do not materially add to the public disclosures. *See Winkelman*, 827 F.3d at 212 ("Offering specific examples of [the fraudulent] conduct does not provide any significant new information where the underlying conduct already has been publicly disclosed.").

The public disclosure bar extends to Relator's claims that Defendant used the same fraudulent scheme it used in Connecticut to defraud federal (and, absent relevant differences in state legal requirements, other state's) healthcare programs. The Court will therefore dismiss Relator's pre-amendment FCA claims and grant Defendant judgment on the pleadings for Relator's post-amendment FCA claims. But some states—Colorado, New York, Virginia, and Washington—"exercise[d] their right to object to dismissal of claims based on public disclosure" under their respective state laws. ECF 108, PgID 3099. In light of the states' arguments about their respective analogous laws and because "[g]enerally, if the federal claims are dismissed before trial the state claims should be dismissed as well," the Court will decline to exercise supplemental jurisdiction over Relator's state law claims. *Garman*,

719 F. App'x at 465 (quoting *Hankins v. The Gap, Inc.*, 84 F.3d 797, 803 (6th Cir. 1996)).

III. <u>Relator's Motion to File Under Seal Motion to Compel</u>

Because the preceding sections of this order conclude the case, the Court finds moot Relator's motion to file under seal his motion to compel.

### ORDER

**WHEREFORE**, it is hereby **ORDERED** that Relator's motion for leave to file sur-reply in opposition to Defendant's third motion to dismiss [111] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant's motion to dismiss for lack of subject matter jurisdiction and for judgment on the pleadings [104] is **GRANTED**.

**IT IS FURTHER ORDERED** that Relator's FCA claims regarding pre-March 23, 2010, conduct are **DISMISSED**.

**IT IS FURTHER ORDERED** that judgment on the pleadings is **GRANTED** in favor of Defendant on Relator's FCA claims regarding post-March 23, 2010, conduct.

**IT IS FURTHER ORDERED** that the Court **DECLINES** to exercise supplemental jurisdiction over Relator's state-law claims.

**IT IS FURTHER ORDERED** that Relator's motion to authorize sealing of Relator's motion to compel [113 (under seal)] is **MOOT**.

This is a final order and closes the case.

**SO ORDERED**.

                                                      s/ Stephen J. Murphy, III
                                                     STEPHEN J. MURPHY, III
                                                     United States District Judge

Dated: December 12, 2019

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on December 12, 2019, by electronic and/or ordinary mail.

                                                       s/ David P. Parker
                                                     Case Manager